Iezhja HARTSELL, By Next Friend Jerry UPTON, Plaintiff–Appellant,

v.

FORT SANDERS REGIONAL MEDICAL CENTER and Dr. Richard O. Manning, Defendants–Appellees.

Court of Appeals of Tennessee, Eastern Section.

April 21, 1995.

Application for Permission to Appeal Denied by Supreme Court Aug. 28, 1995.

Michael H. Meares, Maryville, for appellant.

Rick L. Powers and Jeffrey L. Ingram, Knoxville, for appellee Fort Sanders Regional Medical Center.

R. Franklin Norton and Gary G. Spangler, Knoxville, for appellee Richard O. Manning, M.D.

## OPINION

GODDARD, Presiding Judge (Eastern Section).

This action arises from a complaint filed April 7, 1989, by the Plaintiff, Iezhja Hartsell, a minor, by next friend Jerry Upton, against Fort Sanders Regional Medical Center, Dr. Richard O. Manning and certain nurses in attendance at the Plaintiff's birth.

The Plaintiff was born on Sept. 28, 1983, at Fort Sanders. Dr. Manning was the mother's obstetrician. The complaint, as amended, alleged alternate theories of relief for medical malpractice, battery, outrageous con-

duct, and a violation of T.C.A. 39–4–206 [now 39–15–206] (rights to medical treatment of infant prematurely born during abortion). The Circuit Court for Knox County dismissed the Plaintiff's causes of action for outrageous conduct and violation of T.C.A. 39–15–206. The Court later dismissed the Plaintiff's cause of action for battery. The issue of medical malpractice was subsequently tried on March 2, 1993. The Plaintiff took a voluntary non-suit as to the nurses on March 3, 1993. At the close of the Plaintiff's proof, the Trial Court directed a verdict for Fort Sanders. The jury returned a verdict for Dr. Manning. This appeal followed.

The Plaintiff alleges that the Trial Court improperly limited her causes of action to medical malpractice, that it improperly excluded as unduly prejudicial certain proof that was offered, and excluded proof as to the Hospital's standard of care. Further, the Plaintiff claims that the Judge erred by failing to instruct the jury on a physician's duty not to abandon his patients. Specifically, the Plaintiff submits the following issues on appeal:

I. Did the trial court err in limiting Plaintiff's causes of action to medical malpractice?

A. Did the trial court err in sua sponte dismissing Plaintiff's Complaint for Battery when she was harmfully and offensively touched without her consent, either express or implied in law or fact?

B. Did the trial court err in dismissing Plaintiff's Complaint for civil remedies under Tenn.Code Ann. § 39–4–206 (now 39–15–206), when the Tennessee Legislature had mandated a statutory minimum standard of care for live born infants?

C. Did the trial court err in dismissing Plaintiff's Complaint for Outrageous Conduct when Defendant left the newborn Plaintiff to die in a hospital apart from her mother, unsupported and gasping for breath from approximately 7:35 a.m. until 8:20 a.m.?

II. Even if the trial court did not err in limiting Plaintiff's causes of action to medi-

cal malpractice, did it err in its instructions to the jury and evidentiary rulings on medical malpractice?

A. Did the trial court err in failing to instruct the jury on a physician's duty not to abandon his patients?

B. Did the court err in excluding evidence that Defendants did nothing for the newborn Plaintiff until she "did not stop gasping at the end of five minutes" and further that Defendants stopped their resuscitation efforts when she "had a heart rate in excess of 100?"

C. Did the trial court err in prohibiting any impeachment of Defendant's witnesses with the Hospital's claim of having kept a 2 lb, 14 oz premature baby alive in 1924?

D. Did the trial court err in excluding proof of the Standard of Care as enunciated by Judicial Council of the American Medical Association when Defendant Doctor had admitted the accuracy of the A.M.A.'s ethical rulings and had contractually agreed to abide by them?

III. Did the trial court err in directing a verdict in favor of Defendant Hospital when there was material evidence in the record which would support a verdict for the Plaintiff?

Iezhja Hartsell was born prematurely September 28, 1983, weighing only 1 pound, 5–3/4 ounces at birth. Her mother was an admitted cocaine and marijuana user and, as such, a high-risk patient. Dr. Manning was not in the delivery room at the time of the delivery. The nurses who delivered the baby began pumping oxygen to her lungs through a tube in her throat. When Dr. Manning learned this he ordered the removal of her breathing tube (called "extubation"), saying the infant was too premature to be viable. Almost one hour later, the baby was still breathing. The baby's mother had received Demerol shortly before giving birth, which made it more difficult for the baby to breathe on her own after birth. However, no drugs were given to the baby to counteract the effect, and no efforts were made to assist the

baby in breathing. After the baby had been extubated, she was weighed and tagged in preparation for her death. Approximately one hour after her birth, the baby was still breathing, and was transported to the Premature Nursery at Fort Sanders. A neonatologist from nearby East Tennessee Children's Hospital was called in. The baby survived, with only a loss of hearing and accompanying speech problem, allegedly due to the lack of oxygen during the first hour of her life. The Plaintiff is in most other respects a normal, healthy child today.

The three sets of issues raised by the Plaintiff will be dealt with in the order presented. The first deals with the Trial Court's limiting the Plaintiff's cause of action to medical malpractice.

The Plaintiff first contends that the Trial Court erred in dismissing the Plaintiff's cause of action for battery.[1] The Plaintiff contends that the act of administering Demerol to the mother and consequently to the Plaintiff via her mother's bloodstream, and the extubation, were two distinctive acts of tortious conduct constituting battery.

■ The first act, administering Demerol to the mother, clearly is not battery, since the mother had consented via contract with Dr. Manning for medical care, including the administration of proper drugs. The Plaintiff concedes that since this action was consensual, the only proper cause of action would lie in medical malpractice.

■ The issue of whether the extubation constitutes a battery depends on whether there was consent. If we find that the extubation constitutes a battery, it does not necessarily mean that there is no action for malpractice. Our Supreme Court has said that when battery exists, malpractice is not necessarily reached, but if no battery can be shown, the issue becomes one of malpractice. *Cardwell v. Bechtol,* 724 S.W.2d 739 (Tenn. 1987). Clearly, the Plaintiff was not able to

give consent, but the Defendants maintain that the Plaintiff's mother gave consent. The mother, Leiza Hartsell, executed a special permit form when she was admitted to the Hospital the day the Plaintiff was born. The Trial Court noted that Dr. Manning had the consent to treat not only the mother, but also the baby. Since the Defendants were authorized to administer medical care, the extubation was consensual. We therefore find that the Trial Court correctly concluded that the Plaintiff's cause of action was for medical malpractice, not for battery.

■ We next turn to the issue of whether the Trial Court correctly dismissed the Plaintiff's complaint for civil remedies under T.C.A. 39–4–206 (now 39–15–206). That Section is titled "Rights to medical treatment of infant prematurely born alive during abortion." The Plaintiff claims that the language of the Statute requires medical personnel in attendance of a prematurely born infant to render aid. The Section reads in pertinent part as follows:

> (c) No cause of action for wrongful death shall be brought which arises out of the death of a fetus or infant during the course of a lawful abortion, whether such fetus or infant is quick or not, so long as the abortion is performed in accordance with the provisions of this part; however, once an infant is born alive, any person in attendance thereto shall be civilly responsible for providing all reasonable and necessary care reasonable under the circumstances in the general vicinity in which they practice.

Abortion is defined by T.C.A. 39–15–201, as follows:

> (1) "Abortion" means the administration to any woman pregnant with child, whether such child be quick or not, of any medicine, drug, or substance whatever, or the use or employment of any instrument, or other means whatever, with the intent to destroy such child, thereby destroying such child before its birth.

---

1. The Plaintiff claims that the Trial Court dismissed this action *sua sponte.* However, the record indicates that the claim was dismissed pursuant to a motion for partial summary judgment by the Defendants.

The Plaintiff does not contend that she was born as a result of a failed abortion. Therefore, to find this Section applicable, we would have to hold that it applies to all infants born prematurely, not just to those born in the course of an abortion. The Plaintiff cites no cases, nor can we find any interpreting this Statute to apply to infants born prematurely other than during an abortion.

To extend the natural reach of this Statute would require us to ignore its plain language. This Section provides that a fetus born alive during an abortion is to be treated as a live birth, and to be accorded the same level of care afforded to all other premature births. The clear language of the Statute shows that it was designed to protect babies born during an abortion, not all babies born prematurely. This is not to say that premature babies are not to be protected. But this Section does not give babies born prematurely a special cause of action beyond that which they are already assured under the law of medical malpractice. We find that the Trial Judge was correct in dismissing the Plaintiff's cause of action for civil remedies under T.C.A. 39–4–206.

■ The next issue presented is whether the Trial Court erred in dismissing the Plaintiff's complaint for outrageous conduct in leaving the Defendant to die. The Plaintiff maintains that it was outrageous conduct to take her away from her mother, away from the nursery, and leave her to die while a nurse instructed a co-worker on the procedure for preparing her for death. It is important to note that the Plaintiff is complaining of conduct bestowed upon her, not on the effect of the conduct on her mother. Tennessee courts recognize the tort of outrageous conduct. *Medlin v. Allied Investment Co.,* 217 Tenn. 469, 398 S.W.2d 270 (1966). See also: *Johnson v. Woman's Hospital,* 527 S.W.2d 133 (Tenn.App.1975). According to *Medlin,* before an action for outrageous conduct can be sustained: "(a) the conduct complained of must have been outrageous, not tolerated in civilized society, and (b) as a result of the outrageous conduct, there must be serious mental injury."

We hold the Trial Court was correct in dismissing the Plaintiff's complaint for outrageous conduct. The Plaintiff failed to allege any mental injury that occurred as a result of the Defendants' actions. In fact, the Plaintiff conceded in her brief that she has "no conscious memory of the ordeal." Instead, the Plaintiff summarily concludes that "[s]een through the minor Plaintiff's eyes, the Defendants' taking her away from her mother, not taking her to the nursery for an hour and instead preparing for her to die while her medical care was abandoned caused both severe physical and emotional distress." This is not enough to make out a claim for outrageous conduct. To find that such conduct was enough to cause the Plaintiff mental distress would mean that she was cognizant of her surroundings. It is highly unlikely that an infant, less than one hour old, would know that she was being taken away from her mother. It is far less likely that she would know what a nursery was, or that she should be in one, or that she was being prepared for her death. The Plaintiff cites the Restatement of Torts as saying that the tort of outrageous conduct is still developing. While this may be true, the law is sufficiently developed to require some kind of mental injury, which is lacking in this case. What might be outrageous conduct to a cognizant adult is not necessarily outrageous conduct to a barely living infant, with no memory of the conduct, nor any signs of mental injury resulting therefrom.

Having concluded that the Trial Court was correct in limiting the Plaintiff's cause of action to medical malpractice, we must now turn to the second set of issues the Plaintiff raises.

■ The Plaintiff first claims that it was error not to instruct the jury on a physician's duty not to abandon his patient. The Plaintiff offered Tennessee Pattern Jury Instructions § 6.08 (now § 6.16), which states:

Once the physician-patient relationship has been established and the physician has undertaken to treat a patient, the physician is under a duty [not to abandon his

patient and] to continue treating the patient unless and until the patient orders the physician off the case, the patient's condition improves so that the physician's services are no longer needed, or the physician gives [due] notice of his intent to quit the case and provides an opportunity for the patient to obtain another physician's services.

The Defendant Dr. Manning claims that there was no error in the Trial Court's not giving the requested instruction because the allegation was not supported by the proof. He maintains that no abandonment occurred, because even though the baby's life support was withdrawn, monitoring of her continued, while Dr. Manning attended to his other patient, the mother.

We believe that the Plaintiff misunderstands the concept of abandonment as it applies to a physician-patient relationship. The Plaintiff maintains that the cessation of medical treatment alone constitutes abandonment. That, however, is not the case. The Pattern Instruction that the Plaintiff submitted is based upon the case of *Burnett v. Layman,* 133 Tenn. 323, 181 S.W. 157 (1915). *Burnett* is a classic illustration of abandonment. In that case, the physician, after becoming alarmed that he had ruptured his patient's urethra, told the patient to find a surgeon and then quickly departed, making no attempt to help or otherwise relieve the patient's pain. The physician in that case obviously believed that further medical care was needed, but refused to administer it, and left the patient. As shown by *Burnett* and cases from other jurisdictions, abandonment requires a complete termination of the physician-patient relationship. See, *e.g., Lee v. Dewbre,* 362 S.W.2d 900 (Tex.Civ.App.1962). ("Abandonment, when used in cases dealing with the physician-patient relationship, generally means the unilateral severance of the professional relationship between himself and the patient without reasonable notice at a time when there is still the necessity of continuing medical attention.")

In this case, the Defendant could not have abandoned the patient, because the relationship was never severed. After determining, in his medical judgment, that no further treatment was warranted, Dr. Manning ordered the extubation. However, the Plaintiff was continually monitored by the nurses, and Dr. Manning ordered a neonatologist to examine the infant. Had the Plaintiff truly been abandoned, neither the monitoring nor the consultation of a specialist would have occurred.

■ Having concluded that no abandonment took place, it is obvious that the Trial Judge was correct in his decision not to charge the Plaintiff's proposed instruction regarding a physician's duty not to abandon his patient. A court is not required to instruct the jury on an allegation that is not supported by the proof. *Guy v. Vieth,* 754 S.W.2d 601 (Tenn.1988).

We next consider whether the Trial Court erred in excluding statements contained in a medical record from Dr. Stephen C. Prinz. The Trial Court excluded the statements on the ground that they were unreliable and that any probative value of the statements was outweighed by the danger of unfair prejudice, pursuant to Tennessee Rules of Evidence 403.[2]

The information the Plaintiff seeks to have reviewed is not part of the record before this Court. It is attached to the Plaintiff's brief as an appendix. Because it is not a part of the record, we cannot review it. Consequently, we are not in a position to determine whether the evidence was properly excluded, and must affirm the Trial Court's decision.

The next issue is whether the Trial Court properly excluded evidence that Fort Sanders had kept alive a premature baby in the 1920s. Fort Sanders was granted a motion *in limine* to exclude the introduction of a television commercial the Hospital aired in 1988 regarding the Hospital keeping a 2–

2. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

pound, 14–ounce premature baby alive in 1924.

■ Fort Sanders argues that the issue was waived by the Plaintiff in that she failed to raise it in her motion for a new trial. We agree. The Rule regarding such waiver is clear:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, ... or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tennessee Rule of Appellate Procedure 3(e).

The Plaintiff did not raise the issue of the excluded evidence in her motion for a new trial. That failure constitutes a waiver of the issue on appeal. See *Mason v. Tennessee Farmers Mut. Ins. Co.,* 640 S.W.2d 561 (Tenn.App.1982).

■ We next turn to the issue which complains of the Trial Court's excluding proof of American Medical Association rulings when Dr. Manning had contractually agreed to abide by those rulings. Again, we find that this alleged error has been waived.

The Plaintiff's Attorney attempted to introduce the evidence of the AMA rulings twice during trial. The first time, counsel tried to read into evidence a request for admission regarding the AMA rulings. That attempt was objected to on the grounds of hearsay. Counsel for the Plaintiff again tried to enter the opinions during the testimony of a witness. Both attempts were made on the first day of trial, and no offer of proof was made for either on that day. Counsel for the Plaintiff did try and offer the first attempt into proof at the close of all proof, but that was denied by the Trial Court, because it was not made the day the evidence was excluded. It is arguable that it was within the discretion of the Trial Court whether to allow the offer of proof at that time. But assuming that it was not within

the court's discretion, we do not think that it was anything more than harmless error to refuse to allow the testimony. As the Plaintiff concedes, ethical opinions are not the standard of care in Tennessee. The standard of care in a medical malpractice action is determined by competent expert medical testimony, according to T.C.A. 29–26–115. See also: *Payne v. Caldwell,* 796 S.W.2d 142, 143 (Tenn.1990):

> We see no ambiguity or lack of clarity in the dictates of T.C.A. § 29–26–115. It provides unequivocally that each of the three basic elements of a medical malpractice action—the standard of care, the breach of the standard, and proximate cause—be proven by testimony of experts who were licensed and practicing in Tennessee or a contiguous bordering state during the year preceding the date that the alleged injury or wrongful act occurred.

Thus, the AMA opinion does not establish the standard of care, and its exclusion was not error.

■ The final issue that the Plaintiff presents is whether the Trial Court erred in directing a verdict for Fort Sanders Hospital. The Plaintiff maintains that she established the Hospital's standard of care, that said standard of care required consent of the patient to withdraw life support, and that no consent was obtained. Fort Sanders maintains that the Plaintiff offered no proof regarding a Hospital's standard of care, and because no prima facie case was established as to it, a directed verdict was proper. Once again, we must find the issue without merit.

Because we have held that the Trial Court properly limited the Plaintiff's cause of action to medical malpractice, the issue of whether a directed verdict was proper turns on whether the Plaintiff presented material evidence to support that theory.

To find that the Plaintiff presented evidence that she established the Hospital's standard of care would require us to read more into the record than is there.

The Plaintiff claims that she established Fort Sanders' standard of care by the testimony of Larry B. Snodgrass, who at the time of the Plaintiff's birth was the associate risk manager at the Hospital. The Plaintiff's attorney asked Mr. Snodgrass about a 1983 accreditation manual for hospitals. Fort Sanders was accredited in 1983. The Plaintiff claims that the following testimony of Mr. Snodgrass, referring to the accreditation manual, establishes a standard of care requiring the Hospital to obtain informed consent before treating a patient:

Q: The patient should not be subjected to any procedure without his voluntary, competent, and understanding consent or that of his legally authorized representative.

A. Yes. I would say that would be reasonable.

Q. And applicable to Fort Sanders Hospital back on that date [when the Plaintiff was born]?

A. Yes.

The Plaintiff then argues that there was no procedure in place to guarantee that consent would be obtained for withdrawing life support from a minor child who was unable to give consent. Mr. Snodgrass also testified, however, that the Hospital did not have a responsibility for obtaining informed consent:

Q. Well, what you agreed with me with, I believe, was that the corporation, the hospital, had some responsibility with regard to making sure that the patients within the hospital—consent was obtained before medically significant procedures were performed upon them, correct?

A. The hospital does not have the responsibility for informed consent. The hospital does take consent forms.

Mr. Snodgrass further testified that the decision to withdraw life support was to be made by the doctor and patient, or the patient's surrogate. Thus, Mr. Snodgrass' testimony did not establish a standard of care applicable to Fort Sanders that would require it to insure informed consent was ob-

tained from the minor regarding the extubation. Consequently, the Plaintiff did not prove that Fort Sanders had an applicable standard of care for this situation, and was therefore unable to prove a breach of that standard. The directed verdict was appropriate as to Fort Sanders.

For the reasons stated above, the judgment of the Trial Court is affirmed and the cause remanded for collection of costs below. Costs of appeal are adjudged against the Plaintiff and her surety.

FRANKS and McMURRAY, JJ., concur.