IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 5, 2002 Session

**JOHN DOE 1, A MINOR CHILD, BY NEXT FRIEND, JANE DOE 1; JANE
DOE 1, INDIVIDUALLY; AND JOHN DOE 2 v.
ROMAN CATHOLIC DIOCESE OF NASHVILLE, ET AL.**

**Appeal from the Circuit Court for Davidson County**
**No.'s 00C-164 and 00C-172      Walter C. Kurtz, Judge**

---

**No. M2001-01780-COA-R3-CV - Filed September 22, 2003**

---

This appeal involves claims of intentional infliction of emotional distress through outrageous conduct. John Doe 1, his mother, and John Doe 2 seek to hold the Roman Catholic Diocese of Nashville liable for injuries caused by the alleged outrageous conduct of the Diocese in its dealings with Edward McKeown, a former priest, who sexually molested John Doe 1 and John Doe 2 a number of years after his affiliation with the Diocese ended. The trial court granted the Diocese's summary judgment motion, finding the Does had failed as a matter of law to satisfy the threshold requirements for stating a claim for the tort of outrageous conduct. The plaintiffs appeal that decision. Because we find the summary judgment motion was properly granted, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and JOHN H. GASAWAY, III, SP. J., joined.

John A. Day, Christopher J. Pittman, Kelly J. Smits, Brentwood, Tennessee, for the appellants, John Doe 1, Jane Doe 1, and John Doe 2.

Thomas F. Mink, Keith W. Blair, Nashville, Tennessee, for the appellee, Roman Catholic Diocese of Nashville.

OPINION

Edward McKeown became a Catholic priest in 1970. In 1986, a parent reported to Bishop Niedergeses of the Roman Catholic Diocese of Nashville that Mr. McKeown had molested her son when he was a minor attending a Diocesan school in 1972 or 1973. Mr. McKeown admitted to the molestation when confronted by the Bishop.[1] Mr. McKeown was evaluated and diagnosed with a sexual disorder.[2] He was sent to the Institute of Living in Hartford, Connecticut in October of 1986 for treatment.

Upon his release in March 1987, Mr. McKeown returned to Nashville where he continued counseling and underwent Depo-Provera injections, as recommended by the treatment facility. Although Mr. McKeown retained or had reinstated priestly faculties, the Diocese limited his priestly duties to those not involving children. Nonetheless, Mr. McKeown did involve himself in activities where children were present.[3] In 1989, after learning about another disturbing incident,[4] the Diocese began efforts to remove Mr. McKeown from the priesthood. In early spring of 1989, the Diocese issued a Precept which removed Mr. McKeown from the priesthood.[5] Charitable support for Mr. McKeown continued until 1994.[6]

---

[1]There is some dispute regarding whether the Diocese, when it discovered the sexual abuse in 1986, reported the 1972 or 1973 abuse to state authorities. Father Giacosa of the Diocese testified he reported the information to Alice Reid at the Department of Human Services. Ms. Reid does not remember the specific conversation and believes she would have instructed the Diocese differently had the conversation taken place. Prior to the ruling at issue herein, the trial court had dismissed claims of negligence per se based on allegations of failure to report child sexual abuse as required by statute. That dismissal was not appealed. Because the ruling of the trial court under review herein did not require resolution of this factual dispute, the court found it did not prevent summary judgment.

[2]Plaintiffs allege that during this evaluation Mr. McKeown admitted to molesting over thirty (30) boys over a fourteen (14) year period and that this information was included in reports sent to the Diocese.

[3]The Does also allege that the Diocese received another sexual abuse complaint against Mr. McKeown in 1988 regarding a boy in East Tennessee. They also point out notes from a December 1988 meeting of Diocesan officials, where there was discussion of the negative publicity surrounding molestation by priests.

[4]Mr. McKeown gave an underage male a condom as a Christmas gift.

[5]McKeown was ordered to halt performing any and all priestly functions, move off Diocesan property, and to not work for the Diocese in any capacity. The Diocese maintains this action removed Mr. McKeown from the priesthood. The plaintiffs question the legal effect of the Precept and assert the Diocese had continuing authority over and responsibility for Mr. McKeown. The trial court found that it was constitutionally prohibited from delving into Canon Law to determine whether Mr. McKeown remained a priest. However, the court specifically found, "It is clear, however, that after 1989 Mr. McKeown had no active employment relationship with the Diocese and no responsibilities with the church."

[6]The term "charitable support" is a term used by the Diocese to include its assistance to former priests while they transition into the secular world. Here, the Diocese paid Mr. McKeown support of $1,500 per month. In addition, it continued health care benefits for Mr. McKeown, which included the cost of his treatment and therapy until 1990 or 1991. The total amount of support over the period amounted to over $50,000. The Does characterize these payments
(continued...)

Following his termination from the Diocese, Mr. McKeown moved off Diocesan property and into a mobile home community and began working for the Juvenile Court Clerk. He was transferred to the Metro Tax Assessor's Office in 1990, following receipt of information about Mr. McKeown's past. However, Mr. McKeown returned to work part-time in the Juvenile Court Clerk's office in 1994, while still at the Assessor's office. Sometime during this period of time, Mr. McKeown began to molest young boys again.

In 1991, Mr. McKeown met John Doe 2 and his mother at the mobile home community where they all lived. He befriended the family. In 1993, Mr. McKeown started taking John Doe 2 to school and to football games. In approximately 1994, John Doe 2 started spending the night at Mr. McKeown's trailer, and Mr. McKeown began molesting John Doe 2. During 1994, Mr. McKeown molested John Doe 2 on numerous occasions. The child's mother discovered the abuse in May of 1995 and confronted Mr. McKeown.[7]

In October of 1995, John Doe 1 and his mother moved to Tennessee and into the mobile home community where Mr. McKeown lived. They met him at that time, and a friendship developed.[8] In November of 1995, Mr. McKeown started molesting John Doe 1. For the next three years, Mr. McKeown molested John Doe 1 on a weekly basis. Finally, in 1999, John Doe 1 told a friend about the abuse and the friend told Jane Doe 1 who contacted the authorities. Mr. McKeown admitted to the abuse of John Doe 1 and other children from 1973 through 1999 and was criminally prosecuted. He is currently serving a twenty-five year prison term.

As this brief recitation of facts[9] demonstrates, at the time John Doe 1 and John Doe 2 were sexually abused by Mr. McKeown, he had been removed from the priesthood for five years or more. He was not an employee of the Diocese, had no actual or apparent authority to represent the Diocese, and had no indicia of priesthood or other authority from the church. John Doe 1 and John Doe 2 met Mr. McKeown as a neighbor, not through any church-related activities or functions. Neither child was Catholic or had any relationship with the Roman Catholic Church or the Nashville Diocese.

These facts shaped the kind of lawsuit available to the plaintiffs and, as the trial court noted, distinguish this case from other recent lawsuits filed against religious organizations arising from the

---

[6](...continued)
as hush money due to Mr. McKeown's threats to go public with the scandal. However the payments are cast, this disputed fact was not material to the summary judgment motion.

[7]She also reported her concerns to the Metro Police Department.

[8]In fact, at some time, Jane Doe 1 allowed Mr. McKeown to obtain joint custody of her son.

[9]The Plaintiffs have included an exhaustive recitation of the facts related to the Diocese's conduct. We have fully reviewed that well organized presentation of the alleged facts, but have determined, like the trial court, that a more detailed discussion of the factual allegations is not necessary to deciding the issues presented in this appeal.

acts of pedophile clergy or employees.[10]  John Doe 1, Jane Doe 1 and John Doe 2 do not seek to impute liability to the Diocese for the conduct of Edward McKeown under the theories of respondent superior or negligent hiring, supervision, and retention by the church.  Instead, the Does fault the Diocese primarily for not properly investigating and reporting Mr. McKeown to the authorities so that he would have been prosecuted and imprisoned and, consequently, unable to molest them. Rather than seeking to hold the Diocese vicariously responsible for Mr. McKeown's conduct, they assert the Diocese is liable because of its own conduct.

Specifically, the Does argue that the Diocese "engaged in repeated acts designed to conceal wrongdoing by an employee out of fear of financial responsibility and embarrassment with knowledge that others are being or will be harmed by the active silence" which allowed Mr. McKeown to remain in the community and continue to prey on young boys such as the victims here.

John Doe 1, a minor, and his mother Jane Doe 1, individually and as next friend of John Doe 1, initiated this lawsuit; John Doe 2, a minor,  and his mother Jane Doe 2,[11] individually and as next friend of John Doe 2, filed a separate lawsuit shortly thereafter.  The cases were consolidated for some purposes by the trial court.  Although the original complaints named a number of defendants and asserted various causes of action, those were superseded by the pleading that formed the basis for the ruling that is under appeal herein.  A fourth amended complaint was filed naming only Mr. McKeown, the Diocese, and Frank Richards as defendants.[12]  The allegations against Mr. McKeown included outrageous conduct, assault and battery, and negligent infliction of emotional distress.  The cause of action against the Diocese was based solely on outrageous conduct.

The Diocese filed a motion for summary judgment seeking dismissal of the outrageous conduct cause of action.  After hearing argument, the trial court granted the motion and entered an order dismissing the case as to the Diocese.  The Does appealed, seeking review of the trial court's dismissal of the complaint against the Diocese.  This court granted joint motions by the appellants to consolidate their cases on appeal.  The issue before us is whether the trial court properly granted summary judgment in favor of the Diocese on the Does' claim of outrageous conduct.

---

[10]The Does characterize the trial court's ruling as "erroneously dominated by unfavorable comparison between this case and others filed against the Roman Catholic Church on different legal grounds" and argue that the trial court relied on those cases to conclude that the Diocese could not be liable without an active employment relationship.  We do not interpret the trial court's reference to other lawsuits brought under different legal theories to indicate anything other than an explanation of the different nature of the cause of action at issue in this case.

[11]Jane Doe 2's cause of action was dismissed as being barred by the statute of limitations.  She has not appealed.

[12]The allegations against Frank Richards were for negligent infliction of emotional distress.  Mr. Richards was a former priest that plaintiffs alleged learned in 1980 that Mr. McKeown had molested a young man in the early 1970s and had not reported this information.  Mr. Richards also filed a motion for summary judgment seeking dismissal, and the trial court granted the motion. The Does did not seek review of that order.  The trial court described the claim against Mr. Richards as "an imaginative attempt to side-step" its earlier ruling that "there is no cause of action for failure to report sex abuse when the alleged non-reported abuse takes place many years apart and involve different victims."

4

The standards for reviewing summary judgments on appeal are well-settled. Summary judgment is proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Church v. Perales,* 39 S .W.3d 149, 156 (Tenn. Ct. App. 2000). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04**.** Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion--that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak and Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001). The party seeking a summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998).

Summary judgments enjoy no presumption of correctness on appeal. *Pero's Steak and Spaghetti House*, 90 S.W.3d at 620; *Scott v. Ashland Healthcare Ctr., Inc.,* 49 S.W.3d 281, 285 (Tenn. 2001). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Godfrey v. Ruiz*, 90 S.W.3d at 695; *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

"Outrageous conduct" and "intentional infliction of emotional distress" are simply different names for the same cause of action. *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997); *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888 (Tenn. Ct. App. 2000). It is sometimes referred to as "intentional infliction of emotional distress through outrageous conduct," or, as the Restatement names it, "outrageous conduct causing emotional distress." These longer titles more accurately reflect the elements that must be present to sustain a claim based on this intentional tort.[13]

For a long time, courts, including Tennessee courts, were reluctant to recognize a cause of action for purely emotional, mental, or psychological injury "unconnected with any independently actionable tort or with any contemporaneous or consequential objectively ascertainable injury." *Medlin v. Allied Inv. Co.*, 217 Tenn. 469, 398 S.W.2d 270 (1966). In fact, the first version of the Restatement of the Law of Torts in 1934 took the position there was no recovery for purely emotional injury. Recovery for intentional infliction of severe emotional injury was first added in

---

[13]Plaintiffs have not sued the Diocese for negligent infliction of emotional distress, a separate tort based on theories of negligence including duty, breach of duty, cause in fact, proximate causation, and injury. *See Bain*, 936 S.W.2d at 624; *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996); *Thurman v. Sellers*, 62 S.W.3d 145, 162-63 (Tenn. Ct. App. 2001).

1948, and later refined.[14]  Consistent with the revised RESTATEMENT (SECOND) OF TORTS (1968) ("RESTATEMENT"), the majority of states have recognized that certain kinds of conduct, in certain situations, should subject the actor to liability for emotional distress inflicted by that conduct.  The RESTATEMENT established the definition and elements of the tort that have been adopted by a majority of courts:

> § 46. Outrageous Conduct Causing Severe Emotional Distress
>
> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
> >  (a) to a member of such persons's immediate family who is present at the time, whether or not such distress results in bodily harm, or
> >  (b) to any other person who is present at the time, if such distress results in bodily harm.

In Tennessee, the tort of outrageous conduct was first recognized by our Supreme Court in *Medlin*, 217 Tenn. at 469, 398 S.W.2d at 270.  The Court in *Medlin* faced two questions: (1) whether to recognize a cause of action for purely emotional or psychological injury; and (2) if so, what type of conduct should be required to establish that cause of action.  As to the first question, the Court acknowledged the reluctance of courts in the past to recognize a cause of action for injury to one's "right to emotional tranquility" or "interest in one's peace of mind."  The Court nonetheless found that certain conduct or certain circumstances would subject the actor to liability for severe emotional distress caused by the conduct.  *Id*. 217 Tenn. at 474, 398 S.W.2d at 272.  Later, in *Miller v. Willbanks*, 8 S.W.3d 607, 611-12 (Tenn. 1999), the Court described *Medlin* as holding that, in the context of **intentional** conduct, a plaintiff has a right to emotional tranquility that gives rise to a cause of action for its violation.

In answering the second question and defining the kind of conduct actionable, the Court in *Medlin* adopted the definition for outrageous conduct causing severe emotional distress found in Section 46(1) of the RESTATEMENT, quoted above, and noted this definition was clarified in the comments which provide, in pertinent part:

---

[14]For a history of the development of a cause of action for intentionally caused severe emotional distress, including the RESTATEMENT'S amendments, *see Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 67-68 (Tex. 1998); DAN B. DOBBS, 2 THE LAW OF TORTS § 303 (2001); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 12 (5th ed. 1984);Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness*: *Intentional Infliction of Emotional Distress by Outrageous Conduct*, 82 COLUM. L. REV. 42 (1982) For a history of the development of the tort in Tennessee, see *Miller v. Willbanks*, 8 S.W.3d 607, 610-12 (Tenn. 1999).

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Medlin*, 217 Tenn. at 478-79, 398 S.W.2d at 274 (quoting RESTATEMENT, *supra* § 46, cmt. d.).

The Court in *Medlin* found the defendant's conduct did not meet this high standard and that plaintiff had not alleged a course of conduct that could be characterized as outrageous.[15] In most of the cases after *Medlin*, our courts have focused on the question of whether the plaintiff had shown the two basic elements of the tort of outrageous conduct established in *Medlin*, *i.e.*, (1) the conduct of the defendant was so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society; and (2) the conduct resulted in serious mental injury to the plaintiff. *Id. See, e.g. Bain*, 936 S.W.2d at 622 (finding that hospital's policy of placing patients known to be HIV infected in the same room with patients not so infected without warning or consent did not constitute outrageous conduct and stating "[a]lthough no perfect legal standard exists for determining whether particular conduct is so intolerable as to be tortious," the high threshold standard described in Comment d. to Section 46(1) of the RESTATEMENT applied); *Alexander v. Inman*, 825 S.W.2d 102, 105 (Tenn. Ct. App. 1992) (holding defendant's affair with plaintiff's wife, though inappropriate and unacceptable, did not constitute outrageous conduct as defined by our courts and the RESTATEMENT).

These two elements, however, do not define the scope of the tort. Regardless of how outrageous, unacceptable, or even despicable a defendant's conduct may be, not all such conduct results in liability to the particular plaintiff. A defendant may not be liable in an action for intentional infliction of emotional distress through outrageous conduct in the absence of other required elements. Those requirements are also found in § 46 of the RESTATEMENT.

First, the conduct complained of must be intentional or reckless. *Miller*, 8 S.W.3d at 612; *Bain*, 936 S.W. 2d at 622. "A negligent or inadvertent act will not give rise to a claim of outrageous conduct." *Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 138 (Tenn. Ct. App. 1975). The intent requirement relates not just to the act, but also to its consequences. *See* W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS, § 8 (5th ed. 1984) (intent includes the desire to bring about certain results as well as the knowledge those results are substantially certain to occur).

---

[15] The defendant, a mortgage lender, had incorrectly determined that the Medlins had failed to make an installment payment and sent a notice of default to FHA, who sent a notice of foreclosure to the Medlins. The Medlins attempted to straighten out the error and, after additional mistakes by the company, the Medlins were eventually declared to be current in their payments. Mrs. Medlin claimed that in her dealings with the company, an agent of the company had been verbally abusive and insulting to her. These telephone conversations and the receipt of two foreclosure notices aggravated her existing nervous condition.

The RESTATEMENT groups this tort with other intentional torts, characterized as intentional invasions of interest in personality, including battery, assault, and false imprisonment. All involve acts that are tortious because they are intended to cause an invasion of a legally protected right. RESTATEMENT, *supra* § 6. "Intent" is used throughout the RESTATEMENT "to denote that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT, *supra* § 8A.[16] Section 46(1) itself relates the defendant's intent to the effect of his or her acts. Section 46 applies where the actor desires to inflict severe emotional distress and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It also applies where the actor acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow. RESTATEMENT, *supra* § 46 cmt. i. Additionally, the RESTATEMENT makes clear that the rule in § 46 "creates liability only where the actor intends to invade the interest in freedom from severe emotional distress." RESTATEMENT, *supra* § 47 cmt. a.[17]

Accordingly, it has been held that a cause of action for intentional infliction of emotional distress must allege facts showing outrageous conduct which is "of a nature especially calculated to cause . . . mental distress of a very serious kind." *Christensen v. Superior Court*, 820 P.2d 181, 203-04 (Cal. 1992) (quoting *Ochoa v. Superior Court*, 703 P.2d 1, 4 n.5 (Cal. 1985)); *see also Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (holding that the conduct must be "intended only to cause extreme emotional distress to the victim."); *Vallinoto v. DiSandro*, 688 A.2d 830, 839 (R.I. 1997) (although plaintiff alleged the defendant's sexual misconduct was intentional, the tort also requires an intent to inflict emotional injuries). The intent or reckless disregard of the consequences must be specific to a particular person. *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 463 (U.S.D.C. 1997) (holding that "[p]recedent demonstrates that the tort of intentional infliction of emotional distress requires a high standard of intent, that is, the intent must be to actually cause emotional harm and it must be specifically directed toward the person complaining of emotional harm"); *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 67-68 (Tex. 1998) (§ 46 of the RESTATEMENT provides redress only when the tortfeasor desired or anticipated that the plaintiff would suffer severe emotional distress); *Culpepper v. Pearl St. Bldg, Inc.*, 877 P.2d 877 (Colo. 1994) (holding that summary judgment for defendants was proper, in part because plaintiffs failed to show that the defendants acted with the specific intent of causing plaintiffs emotional distress by mistakenly cremating their son's remains or that they acted recklessly with the knowledge there was a substantial probability their conduct would cause emotional distress to those plaintiffs).

---

[16]Comment a. to that section states that "'Intent' is limited, wherever it is used, to the consequences of the act."

[17]Relying on this statement, some courts have held that where the defendant's conduct constitutes another tort such as battery, and the conduct was not intended to cause only emotional distress, a claim for intentional infliction of emotional distress will not lie. *See K.G. v. R.T.R.*, 918 S.W.2d 795, 799-800 (Mo. 1996); *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298-99 (Ky. Ct. App. 1993). Other courts have refused to adopt that position on the basis outrageous conduct is an independent tort and may be premised on conduct that would amount to another tort such as battery. *See Winkler v. Rocky Mountain Conference of the United Methodist Church*, 923 P.2d 152, 160-61 (Colo. Ct. App. 1996).

Tennessee courts have also related the intent requirement to the consequences or effect of defendant's acts. *Bain*, 936 S.W.2d at 622 (quoting the RESTATEMENT); *Women's Hosp.*, 527 S.W.2d at 138 ("which conduct intentionally or recklessly causes such severe emotional distress"). In *Women's Hospital*, the court found that the conduct complained of, displaying the body of a deceased prematurely born infant preserved in a jar of formaldehyde to the mother, was intentional, not inadvertent. "It is admitted in the proof that the display was exactly what was intended." *Id.* The court then concluded that "a jury could find that the conduct of displaying the infant in the manner and under circumstances described was outrageous conduct . . . and that such conduct recklessly caused severe emotional distress to [the mother]." *Id.* at 140. *See also Lawrence v. Stafford*, 655 S.W.2d 927 (Tenn. 1983) (plaintiffs alleged veterinarian's threat to do away with their dog if they did not pay bill was made willfully and with the intention to inflict enough emotional distress to induce them to come up with the money, and court reversed summary judgment for defendant because a jury could find the conduct outrageous); *Moorhead v. J.C. Penney Co.*, 555 S.W.2d 713, 718 (Tenn. 1977) (quoting with approval language that "one who willfully or intentionally causes great emotional distress" can be liable therefor).

In *Gann v. Key*, 758 S.W.2d 538, 547 (Tenn. Ct. App. 1988), this court held that "damages may be recovered for serious emotional damage intentionally or recklessly inflicted by outrageous conduct . . . ." In that case, the plaintiffs alleged that members of the local police department had engaged in a campaign, without sufficient evidence or investigation, to brand as a child abuser and murderer the plaintiffs' son, who was killed by the grandfather of the child who suffered the abuse. This conspiracy was implemented, according to plaintiffs, through various news releases or statements and culminated in newspaper and broadcast stories including statements from the police. The plaintiffs alleged the repeated public statements were "intentionally and outrageously disseminated." *Id.* at 540.

They also alleged that this campaign was "solely designed to inflict extreme mental anguish, distress, anxiety, embarrassment and humiliation" on the plaintiffs and that the conduct of the police officials was willful, wanton, and outrageous, and the statements were made "with the deliberate intention of causing Plaintiffs severe emotional distress, or were made when both [defendants] knew or should have known that they would have such effect." *Id.* at 539, 541. The defendants denied any intention to inflict injury on the plaintiffs. This court stated that, in this summary judgment review, the burden then fell on plaintiffs to produce evidence that the specific act "was made by either or both the defendants with intent to do serious emotional injury to the plaintiffs, or with such recklessness as to impute such an intent." *Id.* at 547. The court found that the evidence presented was not sufficient to support their allegation of intent to do serious injury to the plaintiffs or that the acts were of such a nature "as would ipso facto" impute to either defendant a deliberate intent to injure the plaintiffs. *Id.* at 549.

Thus, the intent element requires that the defendant intend to cause emotional distress to the plaintiff or act in reckless disregard of that consequence to the plaintiff. In both situations, an identified individual (or group individuals) is the object of the intent or reckless disregard. Both intent and reckless disregard must be considered in the context of the particular plaintiff and the

9

defendant's knowledge regarding that plaintiff. For example, this court has recognized and adopted the RESTATEMENT'S comment that "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress . . . ." *Dunbar v. Strimas*, 632 S.W.2d 558, 561 n.1 (Tenn. Ct. App. 1982) (quoting RESTATEMENT, *supra* § 46 cmt. f). Obviously, this factor is relevant only because the defendant's intent and conduct must be directed to a particular individual. The exception is where a bystander is emotionally distressed by conduct directed at another, and in that situation, the defendant's knowledge of the bystander's presence serves the purpose of establishing the substantial certainty or reckless disregard element. KEETON AT AL., *supra* § 12. This limitation is consistent with the remaining element of this intentional tort.

The final requirement for liability to attach is, as the trial court herein found, that the extreme or outrageous conduct must be directed at the plaintiff or occur in the presence of the plaintiff. This conclusion results from § 46 itself, which is divided into two subsections. The first subsection, § 46(1), concerns conduct directed at the plaintiff, and the second, § 46(2), concerns conduct directed at a third person. The requirements for recovery differ depending upon whether the plaintiff was the object of the conduct or was merely present when the conduct, directed at someone else, occurred. *Johnson v. Caparelli*, 625 A.2d 668, 671 (Pa. Super. 1993) (stating that § 46(1) applies to situations where a person suffers emotional distress as a result of outrageous conduct directed at that individual, while "by way of contrast," § 46(2) applies to persons who suffer emotional distress as a result of outrageous conduct directed at a third party); *Christensen*, 820 P.2d at 203-04 (generally, the emotional distress must be caused by egregious conduct toward the plaintiff; the exception is where "the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability his or her conduct will cause severe emotional distress to that plaintiff," who is present at the time of the outrageous conduct).

While § 46(1) does not expressly include the words, "directed at," it is clear from the structure of the entire section on "Outrageous Conduct Causing Severe Emotional Distress" that the requirement is understood. The second subsection begins by distinguishing itself from the first, stating it applies "where such conduct is directed at a third person." RESTATEMENT, *supra* § 46(2). Additionally, none of the fact situations used as examples in Section 46 involve a situation where the challenged conduct was not directed at a specific individual or individuals. *See also*, KEETON, ET AL., *supra* § 12, at 65 (stating, "Where the mental distress is caused by the defendant's conduct which is not directed at the plaintiff, but at a third person, other problems arise," in discussing third party or bystander plaintiffs).

Comment l to the RESTATEMENT, § 46 provides clarification as to the second circumstance in which a defendant can be liable, sometimes called a bystander claim.

> l. Conduct directed at a third person. Where the extreme and outrageous conduct is directed at a third person, as where, for example, a husband is murdered in the presence of his wife, the actor may know that it is substantially certain, or at least highly probable, that it will cause severe emotional distress to the plaintiff. In such

cases the rule of this Section applies. The cases thus far decided, however, have limited such liability to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred. The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited, and the distress of a woman who is informed of her husband's murder ten years afterward may lack the guarantee of genuineness which her presence on the spot would afford. The Caveat[18] is intended, however, to leave open the possibility of situations in which presence at the time may not be required. Furthermore, the decided cases in which recovery has been allowed have been those in which the plaintiffs have been near relatives, or at least close associates, of the person attacked. The language of the cases is not, however, limited to such plaintiffs, and there appears to be no essential reason why a stranger who is asked for a match on the street should not recover when the man who asks for it is shot down before his eyes, at least where his emotional distress results in bodily harm.

A number of courts have addressed the "directed at" requirement. "To support the cause of action, [i]t is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen*, 820 P. 2d at 181. With regard to the first subsection of § 46, "Even malicious, wilful or wanton conduct will not warrant a recovery for the infliction of emotional distress if the conduct was not directed toward the plaintiff." *Meagher v. Lamb-Weston, Inc.*, 839 F. Supp. 1403, 1409 (D. Ore. 1993) (holding that emotional distress is a tort directed at a particular victim); *Potts v. UAP-GA Ag Chem, Inc.*, 567 S.E.2d 316, 321 (Ga. Ct. App. 2002) quoting *Lively v. McDonald*, 522 S.E.2d 711 (Ga. Ct. App. 1999)); *Ryckeley v. Callaway*, 412 S.E.2d 826 (Ga. 1992);); *Dornfeld v. Oberg*, 503 N.W.2d, 115, 118-119 (Minn. 1993) (explaining that the RESTATEMENT contemplates that recovery should be permitted only when the extreme and outrageous conduct is directed at a particular person); *Maguire v. State*, 835 P.2d 755, 761 (Mont. 1992) (determining that because no direct relationship existed between plaintiff and any outrageous conduct, plaintiff was neither a "direct victim" nor present at the time of the conduct, and the claim for intentional infliction of emotional distress was dismissed; *Upchurch v. The New York Times Co.*, 431 S.E.2d 558, 561 (S.C. 1993) (holding that claims of intentional infliction of emotional distress are limited to egregious conduct toward a plaintiff, and the conduct must be directed at the plaintiff or occur in the presence of a plaintiff of whom the defendant is aware)); *Fields v. Teamsters Local Union No. 988*, 23 S.W.3d 517, 531 (Tex. Ct. App. 2000) (in determining whether employer's conduct was outrageous, court looked only at conduct directed at the plaintiff); *Reid v. Pierce County*, 961 P.2d 333 (Wash. 1998) (determining that defendant's actions must be directed at plaintiff or plaintiff must be present at the time of the conduct.)

---

[18]"The Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress." RESTATEMENT, *supra* § 46, at 72. The caveat recognizes certain situations may arise where presence of the plaintiff may not be required. The most often cited example occurred when a man committed suicide in the plaintiff's home, while she was in another room, with certain knowledge she would find his body. The "directed at" requirement was satisfied. *Id*. at 79.

The trial court herein held that the Does did not meet the requirement that the conduct of the Diocese, even if outrageous, must have been directed at a specific or particular person. The Does argue that the trial court engrafted a new element onto the tort. We respectfully disagree.

First, our review of authority convinces us that the trial court merely expressly stated what has been implicit in holdings by Tennessee's courts since the *Medlin* decision. In each of these cases, the conduct complained of was directed at the plaintiff. *See, e.g., Miller*, 8 S.W.3d at 613-14 (doctor caused false rumors throughout hospital that couple's newborn was a "drug baby"); *Lawrence*, 655 S.W.2d at 927 (defendant threatened to "do away" with plaintiffs' dog if plaintiffs failed to pay veterinary bill by a certain time); *Goldfarb v. Barber*, 547 S.W.2d 567 (Tenn. 1977) (professor's removing of student from class); *Moorhead*, 555 S.W.2d at 713 (conduct of collection department against plaintiff customer); *Swallows v. Western Elec. Co., Inc.*, 543 S.W.2d 581 (Tenn. 1977) (employee sued employer over use of detective agency); *Hartsell v. Fort Sanders Regional Hosp.*, 905 S.W.2d 944 (Tenn. Ct. App. 1995) (holding that infant prematurely born during an abortion did not state a claim for outrageous conduct based on hospital personnel taking her away from her mother, abandoning medical treatment, and "leaving her to die" while a nurse instructed a co-worker on the procedure for preparing for her death because she could not show severe emotional or mental injury since she had "no conscious memory of the ordeal" and court could not find she was cognizant of her surroundings); *Dunn v. Moto Photo, Inc.*, 828 S.W.2d 747 (Tenn. Ct. App. 1991) (telling customer that sexually explicit photographs could not be developed while actually developing and sharing such photographs); *Blair v. Allied Main.Corp.*, 756 S.W. 2d 267 (Tenn. Ct. App. 1988) (employee and supervisor exchanged heated words); *Gann v. Key*, 758 S.W.2d at 538 (claim that police conspired to release derogatory statements about plaintiffs' son); *Brian v. Campbell*, 720 S.W.2d 62 (Tenn. Ct. App. 1986) (conduct of mortgagee toward mortgagor); *Bringle v. Methodist Hosp.*, 701 S.W.2d 622 (Tenn. Ct. App. 1985) (employee claim of outrageous discharge by employer); *Dunbar*, 632 S.W.2d at 558 (reporting to emotionally fragile mother of 19-month-old deceased child that child's body showed evidence of sexual abuse); *Woman's Hosp.*, 527 S.W.2d at 133 (displaying plaintiff's deceased infant to her inside a jar of formaldehyde); *Satterfield v. Long*, No. 03-A-01-9805-CV-00162, 1999 WL 820270 (Tenn. Ct. App. Oct. 13, 1999), *amended on reh'g Satterfield v. Long*, No. E1999-000349-COA-R3-CV 2000 WL 281656 (Tenn. Ct. App. Mar. 16, 2000, perm. app. denied Oct. 2, 2000) (supervisor conduct during period prior to termination); *Steele v. Superior Home Health Care*, No. 03-A-01-9709-CH-00395, 1998 WL 783348 (Tenn. Ct. App. Nov. 10, 1998) (perm. app. denied June 7, 1999) (job site sexual harassment); *Vafaie v. Owens*, No. 92C-1642, 1996 WL 502133 (Tenn. Ct. App. Sept. 6, 1996) (no Tenn. R. App. P. 11 application filed) (mailing sexually explicit photographs to plaintiff's husband and threatening to expose past sexual history); *Pursell v. First American Nat. Bank*, No. 01-A-01-9411-CV-00513, 1995 WL 276825 (Tenn. Ct. App. 1995), *aff'd* 937 S.W.2d 838 (Tenn. 1996) (no Tenn. R. App. P. 11 application filed) (creditor's collection methods against debtor); *Wilson v. H.C.A. Southern Hills Med. Ctr.*, No. 01-A-01-9211-CV-00460, 1993 WL 177155 (Tenn. Ct. App. May 23, 1993) (no Tenn. R. App. P. 11 application filed) (providing birth statistics and certificate with footprints stating "I'm a boy" to mother of stillborn fetus without counseling).

The requirement that the conduct be directed at the plaintiff was implicit in the facts of these cases; consequently, the opinions do not directly address the issue because it was simply not raised or relevant. However, in one unreported opinion, this court has expressly stated the requirement. In *Stidham v. Mediquick of Bartlett, Inc.*, No. 14, 1991 WL 116558 (Tenn. Ct. App. July 2, 1991) (no Tenn. R. App. P. 11 application filed), the plaintiff was injured when a rock was thrown from a lawn mower. While at the hospital being treated, she fell off the examining table. Plaintiff's son was in the waiting room and was not told of the fall, but instead misled into thinking she was just drowsy. Plaintiff's lawsuit alleged that the conduct of the hospital was outrageous for trying to cover up her fall to her son. The appellate court upheld summary judgment for the defendant, finding the alleged outrageous conduct was "not directed specifically toward plaintiff. In fact, she was not even in the room where the purportedly offensive act or language occurred, she was utterly unaware of it, it provoked no outrage or mental distress on her part." *Id.* at *1.

In addition, in *Gann v. Key*, this court noted that in all the cases it reviewed the alleged misconduct consisted of acts or words "directly and specially communicated to the injured party." 758 S.W.2d at 546. Acknowledging that in the case before it the acts or words did not occur in the presence of the plaintiffs and were not specially directed toward them, as by mail, the court held "it is reasonable to concede that the use of public communication, such as the news media [as opposed to private communication as by mail], would not immunize one who intentionally or recklessly inflicts serious emotional distress by acts or words which constitute outrageous conduct." *Id.* Thus, the court affirmed the existence of the "directed at" requirement but found it was met in the circumstances of that case.

Second, in *Miller v. Willbanks*, our Supreme Court held:

> By grounding the cause of action for intentional infliction of emotional distress within the Restatement framework [in *Medlin*], we limited recovery to those plaintiffs who could satisfy its requirements.

8 S.W.3d at 612. As discussed above, the RESTATEMENT clearly includes a requirement that the outrageous conduct be directed at a particular individual, either the plaintiff or a third party in the plaintiff's presence. "Simply put, intentional conduct is "directed" at a particular victim; inattention [or negligence] is not similarly 'directed at' a chosen victim." David Crump, *Evaluating Independent Torts Based Upon "Intentional" or "Negligent" Infliction of Emotional Distress: How Can We Keep The Baby From Dissolving In The Bath Water?*, 34 ARIZ. L. REV. 439, 464 (1992).

The trial court herein found:

> However one might judge the conduct of the Diocese, the plaintiffs' case is fatally
> flawed because there is simply not the appropriate link between the alleged conduct
> and the sexual assaults on the plaintiffs.

The court based this holding on the "directed at" element of the tort and its finding that even
if the Diocese failed to report Mr. McKeown when it should have, that conduct was not directed at
the plaintiffs or at anyone with whom the plaintiffs had a close personal relationship. The court also
found there was no proof of the requisite state of mind or intent to cause the consequences and no way
to conclude that the consequences were substantially certain to result. After discussion of the legal
definition of recklessness, the court concluded:

> . . . . there is certainly no intent of harm and whether the issue is considered as one of
> proximate or legal cause or considered under the definition of intentional and/or
> reckless conduct the conduct of Mr. McKeown in committing sexual assaults on the
> plaintiffs is so attenuated and remote from the actions of the Diocese as to be non
> actionable.

The Does strenuously argue that the trial court misapplied and confused the concepts of intent,
recklessness, foreseeability and causation in concluding there was not a sufficient link between the
Diocese's conduct and the harm to the Does. Plaintiffs assert there was sufficient proof of intent on
the part of the Diocese to avoid summary judgment on the basis that the actor need only intend the
act, not the consequences of that act, relying on the "recklessly" language of § 46, the "substantially
certain" language of § 8A,[19] and on comment *i* to § 46 to the effect that § 46 applies not only where
there is intent to inflict emotional distress and where the actor knows that such distress is substantially
certain, but also where the actor acts recklessly in deliberate disregard of a high degree of probability
that emotional distress will follow. Based on these statements and the RESTATEMENT's definition
of reckless, the plaintiffs argue that the intent element of intentional infliction of emotional distress
can be satisfied by a showing that "any reasonable person knew or should have known that emotional
distress may flow from the outrageous conduct."

While counsel for the plaintiffs has skillfully constructed this argument, we disagree that it
sets forth the standard for this intentional tort. Intent, recklessness, and negligence connote different
degrees of culpability and potential liability. RESTATEMENT, *supra* § 8A cmt. a. For conduct to be
considered reckless, the probability that harm will result must be substantially greater than is required
for ordinary negligence. RESTATEMENT, *supra* § 500 cmt. a. The difference in the degree of risk "is
so marked as to amount substantially to a difference in kind." RESTATEMENT, *supra* § 500 cmt. g.

---

[19]As discussed earlier, § 8A of the RESTATEMENT and the comments thereto make it clear that "intent" denotes
that the actor desired to cause the consequences of his act, or that he believes that the consequences are substantially
certain to result from it. Where the actor knows that the consequences are certain, or substantially certain, to result, the
law treats the actor as if he had in fact desired the result. RESTATEMENT, *supra* § 8A cmt. b.

14

The plaintiffs' argument in this regard asks us to incorporate into this intentional tort concepts, such as foreseeability, that apply in negligence-based causes of action. We decline to do so because it would blur if not eradicate the distinction between intentional infliction of emotional distress and its negligence-based counterpart. They are separate torts addressed to substantially different types of conduct affording different types of damages. Additionally, the plaintiffs' arguments regarding intent do not dispense with the "directed at" requirement, and we have already determined that such a requirement exists, in spite of the plaintiffs' arguments to the contrary.

The tort of intentional infliction of emotional distress through outrageous conduct is limited in its scope and applicability. It was recognized solely to subject to liability a defendant who, beyond all bounds of decency "purposely causes a disturbance of another's mental and emotional tranquility." Calvert Magruder, *Mental and Emotional Distrubance in the Law of Torts*, 49 HARV. L. REV. 1033, 1058 (1936).[20] Accordingly, it has been recognized by courts in only certain situations. "The requirements of the rule are rigorous, and difficult to satisfy." KEETON, ET AL., *supra* § 12, at 60-61.

The requirement of specific intent and the requirement that the outrageous conduct be directed at a particular person are related. *See Witherspoon*, 964 F. Supp. at 463; *Gann*, 758 S.W.2d at 546. They are consistent with similar requirements applicable to the other intentional torts with which they are grouped in the RESTATEMENT: battery, assault, and false imprisonment. All those torts, obviously, involve actions and intent toward a particular person. The requirements address concerns of expanding potential plaintiffs beyond those whose interest in emotional tranquility is directly affected by defendant's intentional conduct. They express the factor of proximity, whether temporal or physical, that ensures the distress suffered by the plaintiff is directly related to the defendant's conduct, and that the conduct itself is what provokes the outrage or distress. They also distinguish the intentional tort of outrageous conduct from the negligence based tort of negligent infliction of emotional distress.[21] *Christensen*, 820 P.2d at 203. Adopting the foreseeability argument propounded by the plaintiffs here would eliminate that distinction.[22]

We agree with the trial court that the plaintiffs have failed to allege facts to establish the requirements of this cause of action. As the trial court found, unless the other elements necessary to proceed are present, it is not necessary to reach a decision on whether the conduct of the Diocese

---

[20]This article was one of the most influential statements leading to the RESTATEMENT'S recognition of the tort.

[21]Those requirements are set out in *Bain*, 936 S.W.2d at 622; and *Camper*, 915 S.W.2d at 446. *See also Ramsey v. Beavers*, 931 S.W.2d, 527 (Tenn. 1996) (setting out factors relevant to question of foreseeability in negligent infliction of emotional distress claims based on injury to a third person).

[22]A number of courts have been disinclined to adopt a standard for even *negligent* infliction of emotional distress in which the traditional tort principle of foreseeability, standing alone, defines the scope of a defendant's duty. *See*, *e.g. Chizmar v. Mackie*, 896 P.2d 196 (Ala. 1995); *Delaney v. Clifton*, 41 P.3d 1099 (Or. Ct. App. 2002); *see also* Crump, 34 ARIZ. L. REV. at 439, 464.

could be found by a jury to be outrageous under the applicable legal standard. Accordingly, we affirm the judgment of the trial court.[23]

## CONCLUSION

We affirm the trial court's judgments and remand the case to the trial court for whatever further proceedings may be required. Costs of the appeal are taxed to the appellants, John Doe 1, Jane Doe 1, and John Doe 2.

_____
PATRICIA J. COTTRELL, JUDGE

---

[23]John Doe 2 argues that the trial court erred in denying portions of his motion to compel discovery. It is well settled that decisions with regard to pre-trial discovery matters rest within the sound discretion of the trial court. The decision of the trial court in discovery matters will not be reversed on appeal unless a clear abuse of discretion is demonstrated. *Benton v. Snyder*, 825 S.W.2d 409 (Tenn. 1992); *Paine v. Ramsey*, 591 S.W.2d 434, 436 (Tenn. 1979). A lengthy hearing was conducted by the trial court to address John Doe 2's motion to compel the Diocese to answer various interrogatories and produce certain documents. John Doe 2 argued then and now that the trial court improperly limited his ability to prove that the conduct of the Diocese was outrageous. He does not assert that any of the requested information had any relevance to establishing a link or relationship between the Diocese's conduct and him. In other words, none of the discovery denied or limited by the trial court's order dealt with information that would establish the elements the trial court and this court have found missing in the plaintiffs' claim for intentional infliction of emotional distress through outrageous conduct. Consequently, the issue of the limitation of discovery is now moot in view of our holding.

16