**Faith Elizabeth WARD, et al.**

v.

**Gregory L. GLOVER, M.D., et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Feb. 10, 2006 Session.

June 2, 2006.

Permission to Appeal Denied by Supreme Court Oct. 30, 2006.

Michael J. King, Luis C. Bustamante, and J. Ford Little, Knoxville, Tennessee, for the appellants, Jessie Ward and Regina Marie Ward, individually and as parents of Faith Elizabeth Ward.

Stephen C. Daves, Knoxville, Tennessee, for the appellee, Gregory L. Glover, M.D.

Edward G. White, II, Wayne A. Kline, Joshua J. Bond, and E. Michael Brezina, III, Knoxville, Tennessee, for the appellees, Michael Bullen, M.D., and Women's Health Partners of East Tennessee, P.C.

Robert H. Watson, Jr., Knoxville, Tennessee, for the appellee, Anesthesia Consultants of Knoxville, P.C.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

In this medical malpractice case, Jessie Ward and Regina Marie Ward, individually and on behalf of their minor daughter, Faith Elizabeth Ward ("Faith"),[1] sued a number of defendants, including Gregory L. Glover, M.D., Michael Bullen, M.D., Women's Health Partners of East Tennessee, P.C. ("WHP"), Anesthesia Consultants of Knoxville, P.C. ("ACK"), Baptist Hospital of East Tennessee, Inc., and Baptist Health System of East Tennessee, Inc. (these two latter defendants collectively will be referred to herein as "the Baptist defendants"), seeking damages for catastrophic and permanent injuries to Faith arising out of her birth at Baptist Hospital in Knoxville. The trial court granted summary judgment to ACK. It also granted partial summary judgment to Dr. Glover with respect to the plaintiffs' claims arising out of his role as medical director of the obstetrics (sometimes referred to as "OB") unit at Baptist. All of the plaintiffs' claims against the Baptist defendants were settled. The claims against Dr. Glover arising out of his role as treating physician in Faith's birth and the claims against Dr. Bullen and WHP proceeded to trial. The jury returned a verdict in favor of the remaining defendants. The plaintiffs appeal the grant of summary judgment to ACK and the grant of partial summary judgment to Dr. Glover; the trial court's decision to allow the jury to consider the fault of the Baptist defendants; the trial court's denial of the plaintiffs' motion to waive the locality rule; the court's ruling precluding the introduction of certain of the plaintiffs' medical expenses; and the

---

1. For ease of reference, we, as did the parties, will refer to Faith by her first name. No disrespect is intended by this informal approach.

trial court's instructions to the jury regarding "errors in judgment." In addition, the plaintiffs contend that certain statements made during closing argument by counsel for Dr. Bullen and WHP constitute reversible error. We affirm.

## I.

The plaintiff Regina Marie Ward learned she was pregnant with her second child in June, 2001. Her first child had been delivered by cesarean section ("C-section") in 1997. On June 28, 2001, Mrs. Ward began seeing Dr. Christie Peace of WHP for her obstetrical care. Mrs. Ward indicated to Dr. Peace that she wished to attempt a vaginal birth after cesarean, a procedure commonly referred to as a "VBAC."

Dr. Peace left WHP in December, 2001. From late November, 2001, until February 10, 2002, Dr. Bullen was primarily responsible for Mrs. Ward's care. During this period of time, Dr. Glover provided occasional care. At all times pertinent to this action, Dr. Glover served as the medical director of the obstetrics unit at Baptist Hospital. His "medical director" duties were in addition to his professional responsibilities as an OB/GYN with WHP.

On February 10, 2002, Mrs. Ward awoke in the very early morning hours experiencing pain and discomfort. At 3:43 a.m., her husband called WHP; was connected to the answering service; and was patched through to Dr. Glover, who was the on-call physician that morning. Mr. Ward described his wife's symptoms to Dr. Glover, and Dr. Glover advised the Wards to go to Baptist for evaluation. Dr. Glover then contacted the labor and delivery unit at Baptist and informed them that Mrs. Ward was coming in for a "labor check." The Wards arrived at Baptist at 4:50 a.m., and the nursing staff performed an initial evaluation between 4:50 and 5:00 a.m. As a part of this evaluation, the staff attached a fetal heart rate monitor to Mrs. Ward.

At 5:56 a.m., Mrs. Ward screamed. The nursing staff assessed her condition between 5:58 and 6:01 a.m. At 6:02 a.m., Dr. Glover received a telephone call from Nurse Melody Chellino, who relayed to him that Mrs. Ward had "yelled out" a few minutes prior to the call; that her cervix had dilated to 3 centimeters; and that she was experiencing vaginal bleeding. In addition, Nurse Chellino described the activity reflected by the fetal heart monitor. Dr. Glover testified at trial that Nurse Chellino did not convey a sense of urgency in that telephone call; Nurse Chellino corroborated the doctor's testimony in her own testimony at trial. Dr. Glover told Nurse Chellino that he was coming to the hospital immediately.

In response to the telephone call from Nurse Chellino, Dr. Glover got dressed, went to the bathroom, and then proceeded directly to the hospital, driving within the limits of the applicable traffic laws. At approximately 6:19 a.m., when Dr. Glover was approximately four blocks from Baptist, Dr. Glover received a "STAT," i.e., "immediate," page from the hospital. Dr. Glover testified that he immediately contacted Baptist and spoke to Nurse Chellino, who explained that Mrs. Ward's condition had changed dramatically. Dr. Glover instructed Nurse Chellino to contact anesthesia and prepare Mrs. Ward for surgery. Dr. Glover then sped up and proceeded to the hospital in an emergency fashion.

Dr. Glover testified that he was at Mrs. Ward's bedside by 6:25 a.m. He quickly assessed Mrs. Ward's condition and informed her that he believed her uterus had ruptured, necessitating an immediate C-section. Mrs. Ward was disconnected from the fetal monitor at 6:32 a.m. and was moved to the operating room. Anesthesia arrived at 6:40 a.m., the incision was made

at 6:43 a.m., and Faith was delivered at 6:44 a.m. While performing the surgery, Dr. Glover ascertained that Mrs. Ward's uterus had indeed ruptured, which had caused Faith to be ejected into Mrs. Ward's abdomen. As a result, Faith, while surviving, suffered catastrophic and permanent injuries.

On October 25, 2002, the Wards filed an original complaint for themselves and on behalf of Faith against Dr. Glover, Dr. Bullen, WHP[2], and the Baptist defendants. On February 7, 2003, the plaintiffs filed their second amended complaint, adding as defendants,[3] ACK and its employees, Dr. Mark David Reusche and Ruth Gambill, the latter being a certified registered nurse anesthetist ("CRNA"). ACK was under contract with Baptist to provide anesthesia services for the hospital.

The plaintiffs amended their complaint again on November 13, 2003. This final amended complaint is the controlling pleading with respect to the issues raised on this appeal. In this pleading, the plaintiffs alleged that Dr. Glover deviated from the standard of care by failing to respond in a timely manner to the events of the morning of February 10, 2002. In addition, and as a separate theory of recovery, they alleged that Dr. Glover—in his capacity as medical director of the OB unit at Baptist—failed to meet his contractual responsibilities with respect to the hospital's birthing center.

ACK was sued under its "anesthesia" contract with the hospital and also with respect to its allegedly-negligent performance in providing anesthesia services in connection with the birth of Faith.

In January, 2004, the trial court granted summary judgment to both Dr. Reusche and CRNA Gambill.[4] Several months later, the trial court granted summary judgment to ACK, finding that it did not deviate from the standard of care and that ACK's contract with Baptist did not impose a duty on ACK to investigate whether the hospital staff was properly performing its responsibilities. In addition, the court held that there was nothing in the contract that conferred any rights or remedies on third parties, including the plaintiffs.

Dr. Glover filed a motion for partial summary judgment regarding the plaintiffs' allegations pertaining to his role as medical director of the obstetrics unit. The trial court granted this motion, finding that "the existence of any duty owed by Dr. Glover in [his] capacity of medical director to the plaintiffs must be based upon the contract that existed between Dr. Glover and the hospital" and that, since there is no provision in the contract that would make the plaintiffs third-party beneficiaries, the plaintiffs "are not entitled to predicate an action against Dr. Glover upon his alleged failure to perform his agreement with [Baptist] satisfactorily."

The plaintiffs raised two pretrial issues that are pertinent to this appeal. They

---

2. The original complaint named East Tennessee Women's Specialists, PLLC, as a defendant. The complaint was amended on November 19, 2002, to correctly identify the practice group as WHP. The plaintiffs took a voluntary nonsuit as to East Tennessee Women's Specialists, PLLC, on November 27, 2002.

3. Dr. W. Raymond Brown, III, was added as a defendant, but summary judgment was later

granted to him when it was determined that he had not provided any services to Mrs. Ward or to Faith on February 10, 2002. The propriety of that grant of summary judgment is not before us on this appeal. The plaintiffs also named as a defendant, Strategic Practice Partners, Inc., though the plaintiffs later took a voluntary nonsuit as to that entity.

4. These claims are not before us on this appeal.

filed a motion to waive the so-called locality rule.[5] The plaintiffs sought to introduce the testimony of Dr. Frank Manning, a New York physician, whose specialty was maternal-fetal medicine, *i.e.*, perinatology. The plaintiffs contended that, while they had located one expert obstetrician/gynecologist who fell within the parameters of the locality rule, they wished to introduce the testimony of Dr. Manning as well, primarily due to his specialized knowledge as a perinatogist. Initially, the trial court denied the plaintiffs' motion without prejudice. The plaintiffs later renewed their motion; it was again denied.

The plaintiffs also filed a motion for partial summary judgment on the issue of medical expenses, arguing that they should be permitted to introduce evidence of all of their medical expenses and not just those that were actually paid. The trial court denied this motion, holding that the plaintiffs would not be allowed to introduce evidence of that portion of their medical expenses that had been discounted or "written off."

In August, 2004, the Baptist defendants reached a settlement with the plaintiffs and the claims against them were dismissed. Two months later, the case went to trial against Dr. Glover, Dr. Bullen and WHP. On October 25, 2004, the jury returned a verdict in favor of the remaining defendants. The plaintiffs' motion for a new trial was denied. This appeal followed.

While there are many other facts that were material at trial, the plaintiffs do not contend that there is no material evidence to support the jury's verdict. The facts in the foregoing recitation are provided simply as an introduction to the issues raised on this appeal.

## II.

### A.

The issues raised by the plaintiffs present the following six questions for our review:

1. Did the trial court err in granting summary judgment to ACK and partial summary judgment to Dr. Glover?

2. Did the trial court err in permitting the jury to consider the fault of the Baptist defendants?

3. Did the trial court err in denying the plaintiffs' motion to waive the locality rule?

4. Did certain statements made by defense counsel during closing argument constitute reversible error?

5. Did the trial court err in instructing the jury on "errors in judgment"?

6. Did the trial court err in restricting the plaintiffs' evidence of medical expenses to those expenses that were not discounted by providers?

We will address each of these issues in turn.

### B.

The plaintiffs challenge the propriety of the grant of partial summary judgment to Dr. Glover and the grant of summary judgment to ACK. With respect to Dr. Glover, the plaintiffs argue that he "breached his duty of care to the plaintiffs in his role as Medical Director by either failing to properly establish or failing to properly supervise the implementation of policies and procedures at [Baptist]." As to ACK, the plaintiffs contend that it "failed to adopt and prescribe proper procedures to address the needs of the plaintiffs and provide anesthesia services in a timely manner to [the plaintiffs] resulting in a breach of that standard of care."

**5.** *See* Tenn.Code Ann. § 29–26–115(b) (Supp. 2005).

Under these general allegations, the plaintiffs allege a list of specific failures as to each of these defendants.

■ In deciding whether a grant of summary judgment is appropriate, courts must determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. Courts "must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall,* 847 S.W.2d 208, 210–11 (Tenn.1993) (citations omitted).

■ The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. *Byrd,* 847 S.W.2d at 215. Once the moving party satisfies its burden, the burden shifts to the nonmoving party to show that there are genuine issues of material fact requiring submission of the case to a trier of fact. *Id.* The Supreme Court has stated that the evidence relied upon by the non-moving party must be "taken as true," but the High Court has cautioned that there are limitations on how a nonmoving party can create a genuine issue of material fact:

> The nonmoving party may not rely upon the allegations or denials of [its] pleadings in carrying out this burden as mandated by Rule 56.05. The evidence offered by the nonmoving party must be taken as true. Moreover, the facts on which the nonmovant relies must be admissible at the trial.... To permit an opposition to be based on evidence that would not be admissible at trial would

undermine the goal of the summary judgment process to prevent unnecessary trial since inadmissible evidence could not be used to support a jury verdict.

*Id.* at 215–16 (Tenn.1993) (internal footnote omitted).

■ Summary judgment should be granted "when both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion." *Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn.1995) (citation omitted). Since a motion for summary judgment presents a pure question of law, our review of a grant of summary judgment is *de novo* with no presumption of correctness as to the trial court's judgment. *Gonzales v. Alman Constr. Co.,* 857 S.W.2d 42, 44–45 (Tenn.Ct.App.1993).

### 1.

With respect to the trial court's grant of summary judgment to ACK and partial summary judgment to Dr. Glover, the plaintiffs argue that the defendants' actions should be analyzed, not under the rubric of medical malpractice, but rather under principles of common law negligence. In support of their argument, the plaintiffs rely heavily upon the case of *Gunter v. Lab. Corp. of Am.,* 121 S.W.3d 636 (Tenn.2003), in which the Supreme Court, in a case involving the issue of the applicable statute of limitations, analyzed the distinction between claims involving common law negligence and claims alleging medical malpractice:

> When a plaintiff's claim is for injuries resulting from negligent medical treatment, the claim sounds in medical malpractice. When a plaintiff's claim is for injuries resulting from negligent acts that did not affect the medical treatment

of a patient, the claim sounds in ordinary negligence.

*Id.* at 640 (citations omitted). After noting the approach of New York appellate courts with respect to this dichotomy, the Supreme Court opined as follows:

> We embrace this analysis and hold that when a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Id.* at 641. The plaintiffs in the case at bar contend that Dr. Glover's negligence, *in his role as medical director,* did not arise from any diagnosis or treatment of the plaintiffs, but rather "from his negligence as the administrator of the Obstetrics Unit to ensure the availability of services." Similarly, the plaintiffs assert that ACK's alleged failure to adopt appropriate policies and procedures to "ensure the immediate availability of services to a VBAC patient," including Mrs. Ward, must be judged under the principles of law applicable to common law negligence. The "bottom line" of the plaintiffs' position is that in this summary judgment analysis—and at trial in the event these issues are deemed by us to survive the summary judgment stage—they are not burdened with the proof requirements set forth at Tenn.Code Ann. § 29–26–115(a) (Supp. 2005).

We disagree with the plaintiffs' analysis and find that their reliance on *Gunter* is misplaced. In *Gunter,* the plaintiff sued the defendant laboratory, contending that it had negligently performed a paternity test and "overstated the probability" that the plaintiff was the father of a child. *Id.*

at 638. The Supreme Court granted review to determine which statute of limitations should apply: the one-year statute of limitations for medical malpractice actions or the three-year limitations period applicable to personal property tort actions. *Id.* After engaging in the aforementioned analysis, the Court determined that conducting a DNA test for the purpose of establishing paternity has no relation to medical treatment, and, accordingly, that the three-year statute of limitations—and not the one-year medical malpractice statute of limitations—was applicable to the plaintiffs' suit. *Id.* at 641, 642.

A test conducted by a laboratory to establish paternity is undertaken for the sole purpose of determining whether a specific person is the parent of a particular child. Such a test has absolutely nothing to do with a "medical professional" or the "rendition of medical treatment." The same cannot be said about the actions now under review by us. Here, the plaintiffs allege that *medical professionals deviated from the standard of care* when they established policies for the hospital and when they failed to make sure that the adopted policies and procedures were being followed. Furthermore, they allege that these deviations, in turn, *caused injury* to the plaintiffs' child. We hold that such allegations describe conduct "which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional." *Id.* Policies—and their implementation—pertaining to (1) the operation of an OB unit at a hospital or (2) services performed at a hospital, "bear[ ] a substantial relationship" to a medical caregiver's rendition of medical treatment.

We hold that the plaintiffs' claims must be analyzed under the medical malpractice statute, which provides that a plaintiff must prove, at trial, the following:

(1) the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn.Code Ann. § 29–26–115(a).

### 2.

■ As a separate argument, the plaintiffs contend that both Dr. Glover and ACK were burdened with a duty to the plaintiffs based upon the Rules of the Tennessee Department of Health, Board for Licensing Health Care Facilities ("the Department"). They point to the following rule of the Department:

> Whenever the rules and regulations of this chapter require that a licensee develop a written policy, plan, procedure, technique, or system concerning a subject, the *licensee* shall develop the required policy, maintain it and adhere to its provisions. A hospital which violates a required policy also violates the rule or regulation establishing the requirement.

Tenn. Comp. R. & Regs. 1200–8–1–.04(4) (2005) (emphasis added). The plaintiffs assert that the defendants failed to develop and maintain proper policies, in violation of these regulations. We disagree with the underlying premise of the plaintiff's assertion, *i.e.,* that the quoted language is directed at these defendants. A "licensee" is defined as "[t]he person or entity to whom the license is issued."

Tenn. Comp. R. & Regs. 1200–8–1–.01(47) (2005). In the case at bar, the license was issued to a "health care facility," *i.e.,* Baptist Hospital. Neither Dr. Glover nor ACK is a licensee under this rule. Simply stated, this rule only applies to licensees. It has no application to, or bearing upon the obligations of, a non-licensee. Therefore, it cannot form the basis for a charge of negligence against either Dr. Glover or ACK.

■ With respect to ACK, the plaintiffs also point to the Department's rule pertaining to anesthesia services, which rule states that a *hospital* providing anesthesia services must provide them "in a well organized manner under the direction of a qualified doctor of medicine or osteopathy" and that the anesthesia service "is responsible for all anesthesia administered in the hospital." Tenn. Comp. R. & Regs. 1200–8–1–.07(2)(a) (2005). This rule simply states that an anesthesia group employed by a health care facility will be the entity to provide anesthesia services at the hospital. The subject rule does not expressly or by implication provide a basis for a finding of liability for the *improper* administration of anesthesia. This is not to say that the improper delivery of such services is not actionable; rather, we are merely saying that the subject rule does not address this issue and hence cannot serve as a basis for a finding of liability against ACK.

### 3.

As to the claims against Dr. Glover in his role as medical director, the plaintiffs charge that Dr. Glover did not comply with the terms of his contract with Baptist in formulating appropriate policies and procedures to be followed in the obstetrics unit; that Dr. Glover failed to "properly supervise the implementation of policies and procedures" at Baptist; and that the plain-

tiffs are third-party beneficiaries under the contract. We hold that the trial court was correct in granting Dr. Glover summary judgment on the plaintiffs' claims based upon the doctor's contract.

■■■ The overarching rule in the interpretation of contracts is to ascertain the intent of the parties. *West v. Laminite Plastics Mfg. Co.,* 674 S.W.2d 310, 313 (Tenn.Ct.App.1984). If the language employed by the contracting parties is plain and unambiguous, the meaning is a question of law; in such a situation, a court's function is to interpret the contract as written according to its plain terms. *Petty v. Sloan,* 197 Tenn. 630, 277 S.W.2d 355, 359 (1955). The language of a contract must be construed in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn.1975). An unambiguous contract must be interpreted as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat'l Bank of Crossville,* 620 S.W.2d 526, 530 (Tenn.Ct.App.1981). Courts cannot make contracts for parties, but can only enforce the contract which the parties have entered into. *McKee v. Continental Ins. Co.,* 191 Tenn. 413, 234 S.W.2d 830, 831 (1950).

The contract provides that Dr. Glover will "provide professional direction in keeping with and in accordance with the 'Bylaws of the Medical and Dental Staff', the policies of the Hospital's Medical Staff, the rules and regulations of the Hospital, the applicable standards of the Joint Commission on Accreditation of Health Organizations ['JCAHO'], and all other applicable laws and regulations of the State of Tennessee and of the federal government." In addition, the agreement requires Dr. Glover to do the following:

(a) Be available to consult with and to offer guidance to the OB, in the formulation of policies and procedures for the effective and efficient operation of the OB;

(b) Work with the OB Managers in establishing standards for the employment of clinical personnel and be available to offer guidance to the OB staff;

(c) Assist the Medical Staff and Hospital in every way possible to ensure that all patients receive high-quality services in the most economical and efficient manner possible;

(d) Serve as a liaison between OB's clinical staff and members of the Medical Staff in promoting the services of the Program, identifying Medical Staff needs that can be met by the OB, explaining and clarifying clinical procedures, and assisting in the resolution of problems and differences of opinion;

(e) Participate in specialized programs of the OB, the primary purpose of which is to increase the quality and general awareness of services available to the community, such as professional seminars, continuing education, in-services, etc.

As the moving party, Dr. Glover had the initial burden of presenting verified facts negating one or more elements of the plaintiffs' cause of action. *See Byrd,* 847 S.W.2d at 215. We will now examine the facts in the record upon which Dr. Glover relies.

In his motion for partial summary judgment, Dr. Glover points to the deposition testimony of the plaintiffs' own expert witnesses, Dr. Dean Cromartie and Dr. Gilad Gross, to demonstrate that he did not breach any of his contractual duties as medical director. When Dr. Cromartie was questioned regarding his opinion of the policies and procedures in place for the obstetrics unit at Baptist, he testified as follows:

Q: So what you're telling us is that your interpretation of the policies and procedures is they looked to be reasonable and appropriate policies and procedures with regard to the VBAC subject generally?

A: Yes.

Q: But the way that they were interpreted or implemented on February 10, 2002, was less than what you interpret the policy or procedures to mandate?

 \* \* \*

A: I think it's less than what they clearly stated, but, yes, they did.

 \* \* \*

Q: But in terms of both the ACOG guidelines and the Joint Commission, whether we call them standards or recommendations, certainly you believe that what Baptist has in effect comports in a reasonable way to those recommendations and guidelines?

 \* \* \*

A: Yes, as long as they're executed right. As I read those policies and procedures, that the doctor should have been notified no later than about 5:30 that Ms. Ward was there having regular contractions that he should have come in. And that had that happened, I think everything—and anesthesia should have been notified, and everything would have fallen into place.

 \* \* \*

Q: What you were asked to do initially was to look at the question as to the hospital in toto in terms of this case, as well as the OB's, and you've testified at some length about your opinions relative to the OB's and the hospital.

A: Right.

Q: I think having scrutinized the policies and procedures and looked at them

in light of ACOG and Joint Commission, you feel they are compliant?

A: Yes, sir.

As can be seen, Dr. Cromartie states that, in his professional opinion, the policies and procedures of the hospital pertaining to the obstetrics unit were "compliant" with respect to all relevant rules and regulations. He responded "yes" when asked the following question:

> So what you're telling us is that your interpretation of the policies and procedures is they looked to be reasonable and appropriate policies and procedures with regard to the VBAC subject generally.

As for the testimony of Dr. Gross, he stated in his deposition as follows:

> [W]ithin this case, you have a problem of [the hospital] not being able to identify a patient who is at risk for a uterine rupture and having available the necessary personnel there to deal with that patient in a potential complication. And the second problem is once the complication did occur, you have the problem of not being able to respond and treat the complication in a necessary manner.

While this testimony obviously criticizes the *hospital staff* for their actions on February 10, 2002, Dr. Gross does not offer any criticism of the policies and procedures in place for the obstetrics unit. There is no testimony or evidence in this record which contradicts, or otherwise brings into question, the opinion of Dr. Cromartie that the subject policies and procedures were appropriate.

 If Dr. Cromartie's verified testimony is true—and we would again point out that there is no evidence reflecting to the contrary—then this evidence stands in stark contrast to the plaintiffs' theory that Dr. Glover failed to formulate appropriate policies for the OB unit. The material

facts before the trial court at the time it heard Dr. Glover's motion for partial summary judgment showed that the policies and procedures that Dr. Glover helped to formulate were in compliance with all applicable rules and regulations and were otherwise proper and reasonable. The material facts in the record lead to only one conclusion, *i.e.,* Dr. Glover is entitled to summary judgment as to the claim of the plaintiffs that he was negligent with respect to the formulation of the subject policies and procedures.

As to the plaintiffs' claim that Dr. Glover—again in his role as medical director—was negligent in that he failed to "properly supervise the implementation of policies and procedures" at the hospital, Dr. Glover contends that his contract with Baptist did not impose a duty upon him to investigate or "police" the actions of the nursing staff to ensure that they were following the policies and procedures. Specifically, Dr. Glover points to the following provisions of the contract:

> (h) *The Medical Director shall not be responsible for the general administration of employer-employee activities. The Medical Director's responsibility as technical advisor shall not relieve Hospital of its responsibilities for management of the OB program. It is not the intention of the parties that the responsibility of the Medical Director herein provided for shall include any direct patient care, and such direct patient care shall be at the request only of the patient's attending physician.*

> \* \* \*

> 6. *OTHER PHYSICIANS AND EM-PLOYEES.* Hospital will handle the credentialing, appointment and reappointment of its physicians working in Hospital's OB program. *Medical Director shall not be responsible for the acts of any physicians, counselors, or*

> *employees treating or counseling patients in the OB program or other patients of Hospital.* Medical Director shall be responsible *only for consulting with Hospital* and other individuals and entities using these facilities as to policies and proper procedures.

(Emphasis added; capitalization, underlining and bold type in original). As can be seen, the contract provides that it is the hospital, and not Dr. Glover, who is responsible for, among other things, the acts of the nursing staff. The contract certainly does *not* affirmatively state that Dr. Glover is responsible for investigating the practices of the hospital staff to ensure that they are in keeping with the policies and procedures in place for the OB unit.

In the face of the contract language, the plaintiffs offer the testimony of several witnesses to support their contention that the contract charges Dr. Glover with a duty to investigate the practices of the nursing staff to make sure that those practices are in conformance with the applicable policies and procedures.

The plaintiffs point to the deposition testimony of Dr. Periclis Roussis, medical director of the obstetrics unit at Fort Sanders Hospital in Knoxville, who stated that *his* responsibilities as medical director at that facility included ensuring that "the policies that have been adopted" are in compliance with the acceptable standards. There are two problems with this testimony. First, the doctor stated what "his" responsibilities were and not what the standard of care is, given Dr. Glover's contract. Furthermore, with respect to the veiled suggestion that Dr. Glover had not ensured that the adopted policies and procedures were in compliance with acceptable standards, the only proof in the record is that the subject policies and procedures were, in fact, in compliance with all applicable rules and regulations. Dr.

Roussis's testimony is of no help to the plaintiffs.

■ The plaintiffs also submitted an affidavit from Dr. Cromartie, in which he testified that, as chairman of the obstetrics unit at a hospital in Mississippi, it was *his* responsibility

> to ensure not only that the policies and procedures promulgated by the hospital complied with the medical standard of care, but I was also entrusted with ensuring that the nursing staff understood and complied with such medical policies and procedures. If, during my review of compliance with the policies and procedures, it came to my attention that the nursing staff was deficient or that the policies and procedures failed to address medical needs such that the care of patients would possibly fall below the standard of care, it was my obligation to bring this to the attention of the hospital and attempt to have the hospital ensure that proper changes were made to the policies and procedures or that the nursing staff corrected their deficiencies.
>
> It was incumbent upon Dr. Glover, as Medical Director for the subject unit at Baptist Hospital, to ensure that the policies and procedures provided sufficient guidance to those personnel who followed said policies and procedures to meet the standard of care. Moreover, it was incumbent upon Dr. Glover to ensure that the nursing staff followed the policies and procedures of the hospital. Consistent with the obligations that I had at hospitals as Obstetrics Director, it would be incumbent upon Dr. Glover, should he find deficiencies in either the policies or procedures and/or the care and treatment provided by the nurses in accordance with these policies and procedures, to report such deficiencies to the hospital and work to enact changes to ensure the standard of care was met.

Dr. Glover's failure to perform the duties and responsibilities as medical director together with his clinical failures resulted in a deviation from the standard of care causing injury to Faith Elizabeth Ward.

(Paragraph numbering in original omitted). Again—and as noted by the trial court—this affidavit testimony of Dr. Cromartie, in the words of the trial court, "does not appear to be based upon any standard of conduct, but based merely on his own experience." What Dr. Cromartie did or did not do as medical director of a hospital in Mississippi is not the issue. By the same token, what Dr. Cromartie personally thinks of Dr. Glover's performance under his contract is also not the issue. What *is* the issue is the applicable standard of care given the language of Dr. Glover's contract with the hospital. Dr. Cromartie's testimony does not allude to the language of Dr. Glover's contract. It is not for Dr. Cromartie to add duties and responsibilities to a contract where such are not expressly stated. We would again stress that Dr. Glover, in his role as the medical director of the OB unit, only had such duties and responsibilities as the parties agreed to in the contract.

The plaintiffs presented further expert testimony. Peter F. Bastone, an expert in hospital administration, opined under oath that it was Dr. Glover's responsibility to review the policies and procedures and that Dr. Glover failed "to observe and evaluate practices." Finally, James Lee Decker, senior vice president of Baptist Health System at the time of Faith's injuries, gave the following deposition testimony in response to questions posed to him:

> Q. Okay. Did [Baptist Hospital's] risk management have any role or function in adopting Policies and Procedures for the operations of the various departments at the hospital?

A. Not in the development of the policies, no, sir.

Q. How about in the monitoring or reviewing those policies or analyzing to determine whether or not the practices were being implemented consistent with the policies?

A. Not that I know of.

Q. Whose responsibility in your administration was it to review the application for the Policies and Procedures to determine whether or not those Policies and Procedures were being properly followed and adopted in the particular department?

\* \* \*

A. Any clinical area—I assume we're talking about Clinical Policies and Procedures as opposed to Management Policy and Procedure—any clinical area of the hospital we would rely on the manager of that area in concert with the key physicians involved in that particular area of the hospital.

Q. Okay. In the Birthing Center that would be the Medical Director, Dr. Glover, and that would be Mrs. Chaires the manager of that unit together with Mrs. Gibbons for the Birthing Center?

A. That's correct.

As we have previously noted, the "Medical Director Agreement" between Baptist Hospital and Dr. Glover does not place upon the doctor a duty to supervise the hospital's staff to ensure that the policies and procedures of the obstetrics unit are being followed. On the contrary, the contract expressly states that the "Medical Director shall not be responsible for the acts of any physicians, counselors, or employees treating or counseling patients in the OB program or other patients of Hospital." Furthermore, the contract acknowledges that the parties agree that "the day-to-day operation of the OB Unit is the responsibility of [the] Hospital."

■ Under the heading of "Entire Agreement," the contract between Dr. Glover and the hospital provides as follows:

This instrument contains the entire Agreement of the parties. It may not be changed orally but only by an agreement in writing signed by both parties.

To the extent that the plaintiffs attempt to rely upon the testimony of Peter F. Bastone, James Lee Decker, or the other experts offered by them, to *add* to Dr. Glover's contractual duties an obligation to "properly supervise the implementation of policies and procedures," they are trying, by way of parol evidence, to modify the doctor's contract to add a responsibility that is not in the unambiguous language of the contract. This they cannot do. *See Airline Constr., Inc. v. Barr,* 807 S.W.2d 247, 259 (Tenn.Ct.App.1990) ("Under the parol evidence rule[,] parol evidence is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete, and unambiguous, absent fraud or mistake or any claim or allegation thereof."). Such evidence is not admissible. Hence, it cannot be used on summary judgment to create a genuine issue of material fact. *See Byrd,* 847 S.W.2d at 215–16. Only admissible evidence can be considered in the summary judgment analysis. *Id.*

■ Dr. Glover's contract with Baptist establishes that he did not have a contractual obligation to ensure that hospital personnel were following the policies and procedures of the OB unit. There is no genuine issue of material fact on this subject. The trial court was correct in granting Dr. Glover summary judgment as to the plaintiffs' "supervision" claims.

■ Finally, even if we were to hold—which we do not—that Dr. Glover, under

the terms of his contract, violated a duty owed to the hospital in his capacity as medical director, we conclude that, in order to be successful on their "medical director" claims against Dr. Glover, the plaintiffs would have to show that they are third-party beneficiaries of that contract. We conclude they are not.

 "Generally, contracts are presumed to be 'executed for the benefit of the parties thereto and not third persons.'" *Owner–Operator Indep. Drivers Assoc., Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn.2001) (citation omitted). In *Owner–Operator*, the Supreme Court restated the criteria for determining whether a party qualifies as a third-party beneficiary of a contract so as to vest it with standing to sue for that contract's enforcement:

A third party is an intended third-party beneficiary of a contract, and thus is entitled to enforce the contract's terms, if

(1) The parties to the contract have not otherwise agreed;

(2) Recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and

(3) The terms of the contract or the circumstances surrounding performance indicate that either:

(a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or

(b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.* at 70.

The trial court stated the following with respect to the issue of whether the plaintiffs were third-party beneficiaries of the Dr. Glover–Baptist Hospital contract:

The Court is constrained to conclude that, in the absence of any provision in the contract that would make the plaintiffs third-party beneficiaries of that agreement, that plaintiffs are not entitled to predicate an action against Dr. Glover upon his alleged failure to perform his agreement with the Baptist Hospital satisfactorily.

While Dr. Glover's contract did not contain an express statement that the contract was not intended to convey rights on third parties,[6] we find nothing in the contract that leads us to believe that any of the other prongs of the *Owner–Operator* test have been met in this case. Accordingly, we agree with the conclusion of the trial court.

The contract now under discussion does not provide the plaintiffs with a basis of liability. Certainly, Dr. Glover would have been liable if he had been negligent in the performance of his professional duties as a treating physician in connection with the delivery of Faith; but this issue has been foreclosed by the jury's verdict, the sufficiency of the factual predicate for which is not before us on this appeal.

### 4.

With respect to their claims against ACK, the plaintiffs assert that ACK "failed to adopt and prescribe proper procedures to address the needs of the plaintiffs and provide anesthesia services in a timely manner to [the plaintiffs] resulting in a breach of that standard of care."

ACK and Baptist entered into a written contract on March 1, 2001, pursuant to

---

6. As will be seen later in this opinion, ACK's contract with Baptist Hospital does contain such a provision.

which ACK agreed to provide anesthesia services at the hospital. ACK's responsibilities included supervision and administration of anesthesia services, and ACK was named as the exclusive provider of these services. ACK agreed to perform anesthesia services in such a manner as to ensure continued high quality service, accuracy of work, and compliance with the requirements of the medical staff, the JCAHO, and other appropriate public and private licensing and/or accrediting organizations.

In support of its motion for summary judgment, ACK relies upon the testimony of Candace Robertson, chairperson for obstetrics for ACK, who testified that ACK, "adhered to the ACOG Guidelines and that [ACK] adhered to the ASA and the ACOG Joint Statement on the optimal anesthesia coverage and that [ACK] adhered to the VBAC Policy that is a policy at Baptist." Mr. Decker agreed that the services rendered by ACK met all of Baptist's standards in the administration of anesthesia services. In addition, ACK points to the testimony of the plaintiffs' own expert witness, Dr. Beth Minzter, who opined that the anesthesiologist and CRNA in the instant case "acted above and beyond the standard of care and the call of duty" in their treatment of the plaintiffs. Dr. Minzter also provided the following testimony on this issue:

Q: And you're not offering any opinion that [ACK], and you already told me what its physicians and CRNA did, but you're not offering any opinion that there was any deviation by the anesthesiology portion of this lawsuit?

A: Yes, that's correct.

\* \* \*

Q: Well, and let me ask you this, I don't expect that your opinion will change any as we go on?

A: Absolutely not.

Q: And there is no more information that you could be given that you have already been given to formulate that opinion?

A: I thought about this so long, you're right, there is absolutely nothing. I feel very strongly, unchangeably strongly about it.

There are no papers and no testimony in the record to the contrary. A genuine issue of material fact as to whether ACK deviated from the standard of care with respect to its contractual obligations has not been created. On the contrary, the evidence is uncontroverted that ACK *did not* deviate from the standard of care.

To the extent that the plaintiffs argue that ACK owed a *duty to the plaintiffs* under the contract with Baptist, the contract clearly states—in a paragraph entitled "No Third Party Beneficiaries"—that "[n]othing in this Agreement, whether express or implied, is intended to confer upon any person or entity not a party to this Agreement, any rights or remedies by reason of this Agreement." Contrary to the plaintiffs' assertion, they are not third-party beneficiaries of the ACK–Baptist Hospital contract. Even if the plaintiffs were deemed to be third-party beneficiaries of ACK's contract with Baptist, the fact remains that the material before the trial court on summary judgment shows affirmatively that ACK (1) did not violate any of the general obligations set forth in its contract and (2) did not deviate from the applicable standard of care in the actual delivery of anesthesia services on the occasion of Faith's delivery. Based upon the "summary judgment" record before us, we conclude that ACK was and is "entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

## C.

▮ Next, the plaintiffs contend that the trial court erred in permitting the jury to consider the fault of the Baptist defendants, which, having previously settled with the plaintiffs, were non-parties at the time of trial. During the trial, the non-Baptist defendants were permitted to offer evidence suggesting that the Baptist defendants were responsible for the plaintiffs' injuries. Both the jury instructions and the verdict form addressed the potential fault of the Baptist defendants. However, the plaintiffs assert that the defendants failed to identify the Baptist defendants as potential tortfeasors in their answers, as is required by Tenn. R. Civ. P. 8.03:

> In pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute . . . comparative fault (including the identity or description of any other alleged tortfeasors), . . . .

*Id.* The Advisory Commission comment to the rule states:

> "Comparative fault" is substituted for "contributory negligence" in light of *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992). Note that the defendant must identify or describe other alleged tortfeasors who should share fault, or else the defendant normally would be barred from shifting blame to others at trial.

In his answer to the plaintiffs' third amended complaint, Dr. Glover states:

> 80. While denying any negligence or fault whatsoever on his part, this defendant relies on the affirmative defense of comparative fault as may be shown through further discovery and proof in this cause.

Dr. Bullen and WHP answered as follows:

> 65. Without an admission of liability or fault to the plaintiffs under any theory whatsoever, and for purposes for stating all potential defenses, these defendants rely upon the doctrine of modified comparative fault and to the extent that the allegations asserted against the co-defendants are proven by the evidence in this case, then any recovery to which the plaintiffs may otherwise be entitled against these defendants must be proportionately reduced by that degree of fault attributable to such co-defendant(s).

In their answers to interrogatories, these defendants did not name any other tortfeasor in response to the plaintiffs' question inquiring as to "any person or entity other than you [who] is, or may be, liable in whole or part for the claims asserted against you in this lawsuit."

The defendants who went to trial point out that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tenn. R. Civ. P. 15.02. The record is replete with references to the fault of Baptist, both prior to and during the introduction of evidence at trial.

The plaintiffs' motion in limine filed prior to trial contains the following statements:

> Under Tennessee's system of comparative fault, the fault of all potential tortfeasors is assessed by the jury. It is expected that the defendants will offer proof with regard to Baptist's potential liability with regard to this claim. The jury will be given an opportunity to assess the fault of [Baptist] and allocate such fault in comparison to the potential fault of the remaining defendants.

During voir dire, plaintiffs' counsel addressed the issue of blame-shifting, stating of the defendants that, "they can claim

fault on Baptist and the basis for fault, and they can tell the jury about my experts and what the testimony may be." When defense counsel subsequently referenced the fault of Baptist during voir dire, plaintiffs' counsel did not object.

On the second day of trial, plaintiffs' counsel represented to the trial court that the defendants "are entitled to their defense of comparative fault, there is no argument in that at all, and whatever fault is assessed to the hospital, that is the hospital's responsibility and they don't have responsibility for that." On that same day, the trial court issued the following preliminary instructions to the jury, without objection from the plaintiffs:

Now, in this case you have heard some mention of the possibility that the Defendants may call upon you to allocate fault to some party who is not in this lawsuit who is someone that we call a nonparty. In that regard, let me instruct you that before the Defendant is entitled to have you allocate any fault to someone who is not a party to this lawsuit, the burden of proof rests upon the Defendants to establish by a preponderance of the evidence that such nonparty was at fault. And in this medical malpractice case that means the Defendants have the burden of establishing by the preponderance of the evidence what the appropriate standard of care for that nonparty was at the time of the treatment in question; that is, the Defendants have the burden of establishing by the preponderance of the evidence the acceptable standard of professional practice that applied to that Defendant (sic) in the performance and delivery of healthcare services in this community or similar communities at the time of the events that make up the subject matter of this lawsuit. And these Defendants must establish by a preponderance of the evidence that that nonparty deviated

or departed from that standard of care, and as a result of that deviation or departure that the Plaintiffs suffered injuries that otherwise would not have occurred or have been suffered.

Now, if it becomes necessary in the proof for me to instruct you further about the allocation of any alleged fault to a nonparty, I will give you further instructions at the appropriate time at the end of the case about that and how you would be called upon to allocate fault among more than one party if you find that more than one party was at fault. You should not speculate why any nonparty is not a party presently in this lawsuit. And I will give you further instructions about the allocation of fault of nonparties when that becomes appropriate at the end of the lawsuit.

During opening statements, counsel for Dr. Glover made numerous references to the fault of Baptist, all without objection from the plaintiffs. In point of fact, the plaintiffs first objected to the mention of the comparative fault of Baptist in the afternoon of the third day of trial. The trial court overruled the plaintiffs' motion to exclude evidence of the comparative fault of Baptist, noting that plaintiffs' counsel "had mentioned to me on a number of occasions in some of the motions that comparative fault would be an issue here, at least that was implied." The trial court ultimately held that it was "inescapable" that the plaintiffs "had notice ... that these Defendants are relying upon the concept of comparative fault."

It is abundantly clear from the record that the consideration of the fault of Baptist was, at a minimum, an issue tried by the implied consent of the parties. *See* Tenn. R. Civ. P. 15.02. In addition, this court will grant no relief to a party "who failed to take whatever action was reason-

ably available to prevent or nullify the harmful effect of an error." Tenn. R.App. P. 36(a); *see also Grandstaff v. Hawks,* 36 S.W.3d 482, 488 (Tenn.Ct.App.2000).

This error is found adverse to the plaintiffs.[7]

### D.

The plaintiffs next assert that the trial court erred in denying their motion to waive the locality rule. We disagree.

Tenn.Code Ann. § 29–26–115(b) sets forth the requirements for expert proof in medical malpractice cases. In order to testify, the medical expert must be

> licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and [have] practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred....

*Id.* However, "[t]he court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available" to testify before the court. *Id.*

In the instant case, the plaintiffs presented two expert medical witnesses at trial: Dr. Cromartie, an OB/GYN, and Dr. Gross, an OB/GYN with a sub-specialty in maternal-fetal medicine. Both of these experts satisfied the locality rule. In addition, the plaintiffs had available to them a third expert witness, though they chose not to use her because she "had a limited command of the English language and would not be able to satisfy the needs of the plaintiffs nor would she have been a very effective witness before a jury."

Despite the fact that the plaintiffs had experts available to them—at least one of whom specialized in maternal-fetal medicine—and presented two of them at trial, the plaintiffs wanted the trial court to waive the locality rule so they could use the testimony of a New York physician, Dr. Frank Manning. The crux of the plaintiffs' argument on the need for the testimony of Dr. Manning is that he was *more* qualified as an expert witness than Dr. Gross because he had "written articles on the subject of perinatology and specifically had examined issues relating to the effects of the lack of oxygen on unborn children." A federal district court in Tennessee has held that, when a plaintiff has "appropriate" expert witnesses, the locality rule will not be waived to allow the plaintiff to "ice his cake" with the testimony of an expert who is allegedly more qualified. *Ralph v. Nagy,* 749 F.Supp. 169, 174 (M.D.Tenn.1990). We agree with the reasoning of the federal court; accordingly, we find no abuse of discretion in the trial court's refusal to waive the locality rule.

The cases relied upon by the plaintiffs do not support their argument. In *Steele v. Ft. Sanders Anesthesia Group, P.C.,* 897 S.W.2d 270 (Tenn.Ct.App.1994), the trial court waived the locality rule to permit the testimony of a CRNA who had spent most of her career practicing in Missouri, but had been living and practicing in Florida the year prior to the plaintiff's injury. *Id.* at 280–81. In upholding the decision of the trial court, this court noted that the CRNA had worked with three other CRNAs in Florida, all of whom had received their training in Tennessee, and that the CRNA in question had attended a continuing medical education conference in Tennessee while living in Florida. *Id.* at 281. The expert witness in *Childress v.*

---

7. We do not find it necessary to address whether the answer of Dr. Glover or the answer of Dr. Bullen and WHP satisfies the mandate of Tenn. R. Civ. P. 8.03.

*Bennett,* 816 S.W.2d 314 (Tenn.1991) was licensed to practice medicine in Tennessee at all relevant times and he met all of the statutory requirements, except that in the year prior to the plaintiff's injury, he was in a residency program in Florida. *Id.* The Supreme Court held that, in those circumstances, it was appropriate to waive the locality rule. *Id.* at 316. In both of these cases, the experts had strong ties to Tennessee or a contiguous state, as opposed to Dr. Manning, who had absolutely no connection to this or a bordering state.

 The plaintiffs also rely on *Pyle v. Morrison,* 716 S.W.2d 930 (Tenn.Ct.App. 1986), in which the trial court waived the locality rule to admit the testimony of an expert witness from Maryland when the plaintiff already had one expert witness from a bordering state. *Id.* at 932. This court upheld that decision, finding that the "statute contemplates that there may be more than one appropriate witness when it uses the plural, 'witnesses.'" *Id.* at 933. However, the court went on to say that the statute "places some *discretion* with the trial court to allow *or disallow* testimony in the interest of equity and justice." *Id.* (Emphasis added). As long as a discretionary decision falls within a range of acceptable alternatives, "reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 223 (Tenn.Ct.App.1999) (citation omitted). Even though the court in *Pyle* saw fit to waive the locality rule, this does not mean that the trial court's decision in the instant case to do otherwise constitutes an abuse of discretion. It was within the "range of acceptable alternatives." Thus, we cannot say that the trial court abused its discretion when it refused to waive the requirements of the locality rule.

## E.

Next, the plaintiffs argue that certain statements made during closing argument by attorney Edward G. White, II, counsel for Dr. Bullen and WHP, constitute reversible error. The statements at issue are as follows:

What we told you at the outset was there are two sides to every story, that old adage, remember I said that in opening statement, I said otherwise we would have never come to this courtroom to lay out for you the fate of Dr. Bullen and Dr. Glover. Never would have been here.

\* \* \*

As I stand here now, I do not believe they [carried their burden of proof on informed consent]. In my heart of hearts I do not believe they did. And why do I believe that?

\* \* \*

Did they carry their burden of proof on informed consent? No. With all due respect, that is my firm belief or I wouldn't have been standing here.

\* \* \*

Foundationally, as far as her opinion about timing of injury *I was unpersuaded* in light of the accumulation of proof that was offered through Dr. Hodges, Patrick Hodges, trained by Dr. Gerald Fenichel, as he said, authority in pediatric neurology, worked on patients together, what did he do, he was very, I thought, at times frankly, ladies and gentlemen, you-guys were going to fall asleep because he had a monotone voice and he was going on and I'd ask a question and sometimes it would keep going, and it would keep going, and I was pacing around up here and I said, well, you know, it is his platform, his area, I'm going to let him talk and I am

glad I did. I am glad I didn't try to tell the man what to say or when to stop or any of those things because by the time he came off the stand yesterday if you didn't have a much better understanding about timing of injury than you had ever had before since the beginning of the lawsuit and any other witness that testified, then *once again, I must have checked my brain at the door and been outside someplace, because I thought it was the best explanation I had heard.*

\* \* \*

That leads us back to something that [counsel for Dr. Glover] said a moment ago, and it was that could things have been done any faster that morning that would have produced a different result. The witnesses, Dr. Smallwood and Dr. Hodges by the virtue of this timeline, they don't believe so, *and I don't believe so either,* that is for you to decide.

(Emphasis added). The plaintiffs did not object to any portion of this argument at the time it was made. The issue was raised for the first time in the plaintiffs' motion for new trial.

■■■■ The law is well-settled in this state that "[a]n objection to the remarks or conduct of counsel must be made at the trial and a ruling had thereon, or they will not be considered on appeal." *Lee v. Lee,* 719 S.W.2d 295, 299 (Tenn.Ct.App.1986). *See also Morgan v. Duffy,* 94 Tenn. 686, 30 S.W. 735 (1895); *Marress v. Carolina Direct Furniture, Inc.,* 785 S.W.2d 121, 126 (Tenn.Ct.App.1989); *Miller v. Alman Constr. Co.,* 666 S.W.2d 466, 469 (Tenn.Ct. App.1983). The plaintiffs failed to object to these remarks at the appropriate time. Their failure to timely object constitutes a waiver of their objection. While the "personal opinion" argument of counsel was not appropriate, it was not so egregious or otherwise harmful to the administration of justice as to warrant a reversal under the facts of this case, even if we were inclined to ignore the plaintiffs' waiver of their right to object.

### F.

■■■■ The plaintiffs next contend that the trial court erred in instructing the jury to consider whether Dr. Glover's actions were an "error in judgment." The relevant jury instruction is as follows:

A physician is not negligent or guilty of malpractice simply because his efforts prove unsuccessful. It is possible for a physician to err in judgment or be unsuccessful in diagnosis or treatment of care without being negligent. An error of judgment is not necessarily evidence of a want of skill or care because mistakes and miscalculations are incident to all of the business of life. A physician will not be liable for a mistake in judgment so long as he exercised the reasonable and ordinary care and competence that was competent to his calling and his specialty.

By undertaking a treatment, a physician does not guarantee a good result or a cure or even that some complications will not result from that care and treatment. Medical science is not an exact science and a physician does not ensure or guarantee the correctness of diagnosis or treatment of care, and even the correctness of his judgment in any given situation. He is not required to use the highest degree of skill or care that may be practiced by persons in his profession.

The plaintiffs first raised this issue in their motion for a new trial. While it is not clear to us whether Dr. Glover challenges the manner in which the objection was raised, we agree with the plaintiffs that it was properly raised. Tenn. R. Civ. P. 51.02 provides:

After the judge has instructed the jury, the parties shall be given opportunity to object, out of hearing of the jury, to the content of an instruction given or to failure to give a requested instruction, *but failure to make objection shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial.* *Id.* (emphasis added). This issue is properly before us.

The plaintiffs do not take the position that this instruction is an incorrect statement of law. On the contrary, the plaintiffs, in their reply brief before this court, admit that the trial court "correctly stated the language in [Tennessee Pattern Instruction] 6.12." The crux of the plaintiffs' argument is that the instruction is not justified by the evidence.

 Parties are entitled to their requested jury instructions if, among other things, they are supported by the evidence. *Ingram v. Earthman,* 993 S.W.2d 611, 636 (Tenn.Ct.App.1998) (citing *Ladd v. Honda Motor Co., Ltd.,* 939 S.W.2d 83, 103 (Tenn. Ct.App.1996); *Spellmeyer v. Tenn. Farmers Mut. Ins. Co.,* 879 S.W.2d 843, 846 (Tenn.Ct.App.1993)). If a requested instruction is not supported by the evidence, the trial court may decline to so instruct the jury. *Ingram,* 993 S.W.2d at 636 (citing *Payne v. Nashville, C. & St. L. Ry. Co.,* 106 Tenn. 167, 173–74, 61 S.W. 86, 87 (1900); *Hartsell v. Ft. Sanders Reg'l Med. Ctr.,* 905 S.W.2d 944, 949 (Tenn.Ct.App. 1995)).

In the instant case, the plaintiffs contended at trial that Dr. Glover did not respond quickly enough on the morning of February 10, 2002, and that this failure to timely respond to the information he obtained during the 6:02 a.m. telephone call from Nurse Chellino was a deviation from the standard of care. Because, so the argument goes, the speed by which the defendant responded to the hospital "did not involve a choice of treatment or a decision between two medically accepted courses of action," the jury should not have been instructed on errors in judgment.

We disagree with the plaintiffs' position on this issue. Without question, Dr. Glover used his medical judgment in all of the decisions he made with respect to Mrs. Ward and Faith on the morning of February 10, 2002: in advising the Wards in their initial telephone call to him; in advising Nurse Chellino on the care and treatment of Mrs. Ward following the 6:02 a.m. phone call; in determining the appropriate course of action to take after evaluating Mrs. Ward upon his arrival at the hospital; and, ultimately, in the delivery of Faith. Dr. Glover certainly used his medical judgment when, after listening to Nurse Chellino describe Mrs. Ward's symptoms at 6:02 a.m., he relayed that he was coming in to the hospital immediately, but did not, at that time, give further instructions with respect to preparations for surgery. Clearly, the timeliness with which Dr. Glover responded following the 6:02 a.m. telephone call involved his medical judgment, thus justifying the jury instruction.

 The plaintiffs rely on the New York case of *Nestorowich v. Ricotta,* 97 N.Y.2d 393, 740 N.Y.S.2d 668, 767 N.E.2d 125 (2002), in which the court found that the "error in judgment" instruction was not appropriate in every case:

> Absent a showing that defendant physician considered and chose among several medically acceptable treatment alternatives the error in judgment charge has been found inappropriate.

*Id.* at 129 (citation and internal quotation marks omitted). In their reply brief, the plaintiffs reference numerous other states which have criticized the "error in judg-

ment" instruction. While these other jurisdictions may have offered criticism of the charge or even found it to be erroneous, these cases do nothing to help the plaintiffs because they are at odds with Tennessee law, which has consistently held that this charge is appropriate. *See Patton v. Rose,* 892 S.W.2d 410, 415 (Tenn.Ct. App.1994); *McPeak v. Vanderbilt Univ. Hosp.,* 33 Tenn.App. 76, 229 S.W.2d 150, 151–52 (Tenn.Ct.App.1950); *Floyd v. Walls,* 26 Tenn.App. 151, 168 S.W.2d 602, 607 (1941). Furthermore, the correctness of the charge must be viewed in the light of *all* of the issues raised at trial, not just those raised on appeal. At trial, the plaintiffs also took the position that Dr. Glover deviated from the standard of care in the decisions he made after arriving at the hospital. The decision to perform an emergency C-section on Mrs. Ward, and all of the decisions surrounding that, certainly involved Dr. Glover's medical judgment. We find this issue to be without merit.

### G.

Finally, the plaintiffs argue that the trial court erred in restricting their evidence of medical expenses to those expenses that were not discounted by providers. Prior to trial, the plaintiffs filed a motion with the trial court seeking to introduce evidence of their total medical charges, which were over $635,000, as opposed to the amount actually paid by the plaintiffs and the insurance companies following the requisite discounting by the providers. The defendants responded by seeking a reduction in their respective liability for damages by contending that a portion of the medical expenses were "written off" by the providers, and that Tenn.Code Ann. § 29–26–119 (2000) precludes recovery of the portion of the expenses that were discounted. That statute provides as follows:

In a malpractice action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury including, but not limited to cost of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

Tenn.Code Ann. § 29–26–119.

The trial court denied the plaintiffs' motion, finding that the relevant statute

limits plaintiffs' potential recovery with regard to medical expenses incurred to actual economic losses. Plaintiffs are entitled to prove the amounts actually paid by plaintiffs or their insurer, and not any gross charges written-off by plaintiffs' healthcare providers.

We have determined that it is not necessary for us to resolve this issue, simply because the jury found for the defendants as to liability on all of the remaining claims. Thus, the jury did not reach the issue of damages. The plaintiffs' issue with respect to whether the trial court erred in excluding evidence of some of the plaintiffs' medical expenses is pretermitted.

### III.

The judgment of the trial court is affirmed. This case is remanded to the trial

court for collection of costs assessed below, pursuant to applicable law. Costs on appeal are taxed to the appellants, Jessie Ward and Regina Marie Ward.